Filed 4/16/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S033149 |
| v. | ) | |
| | ) | San Diego County |
| LA TWON R. WEAVER, | ) | Super. Ct. No. CRN22688 |
| | ) | |
| Defendant and Appellant. | ) | |
| _____ | ) | |

After defendant La Twon R. Weaver[1] waived a jury trial, the court found him guilty of the first degree murder of Michael Broome (Pen. Code, § 187, subd. (a))[2] under the special circumstances of robbery and burglary murder (§ 190.2 subd. (a)(17)), of robbery (§ 211), and of burglary (§ 459).  It also found defendant personally used a firearm in committing each of the offenses (§ 12022.5, subd. (a)) and personally inflicted great bodily injury in committing the robbery and the burglary (§ 12022.7, subd. (a)).  After a penalty trial, the court returned a verdict of death, and it imposed that sentence.  This appeal is automatic.  (§ 1239, subd. (b).)  We affirm the judgment.

---

[1]    In the record, defendant's first name is spelled "Latwon."  But defendant informs us his name is actually spelled "La Twon," and the briefs use that spelling.  Accordingly, we will also use that spelling.

[2]    All further statutory references are to the Penal Code unless otherwise indicated.

1

## I. THE FACTS

### A. Guilt Phase

On May 6, 1992, while robbing a jewelry store, a man identified as defendant shot and killed the store's owner, Michael Broome. The only contested issue at trial was whether defendant was the man who committed the crime. Defendant challenged the prosecution evidence and elicited evidence on cross-examination of prosecution witnesses, but he presented no guilt phase witnesses of his own.

Broome owned Shadowridge Jewelers, located in a shopping center in Vista, California. Sometime after 4 p.m. on May 6, 1992, Patricia Arlich, who owned a nearby store, walked into the alley behind her store to smoke a cigarette. She noticed a car drive past the jewelry store and toward her store. She paid attention because the car was driving slowly. As the vehicle passed, she saw that defendant was the passenger and another African-American male was driving. Arlich returned to her store.

Before 5 p.m. that day, Kimberly Decker was driving out of the shopping center parking lot and stopped beside a car in which defendant was the passenger and another African-American man was the driver. Both men were "slouched down in their seats." Decker stopped beside the vehicle so she could look both ways before entering traffic and found herself looking right at defendant. She smiled but he looked at her "like drop dead." Decker said, "see ya," and drove away.

About 30 to 40 minutes after she first saw defendant, Arlich observed him again walking by her in the direction of the jewelry store. Around that time, Stephanie Swihart observed defendant sitting on a bench in front of the jewelry store. Ricky Black arrived at the shopping center shortly before 5 p.m. to leave flowers at a Crown Books store for a woman he had met there. He waited in his car for about 20 minutes to see if she had found the flowers. During this time, he observed defendant walking back and forth in front of Shadowridge Jewelers "looking very nervous, looking around." Lisa Stamm, a

2

sales clerk at Shadowridge Jewelers, also observed defendant sitting in front of the store for a while.

Mary Deighton, another sales clerk at Shadowridge Jewelers, and Stamm each testified about what happened next. Around 5:15 p.m., defendant entered the store, grabbed a customer named Lisa Maples around the neck, and placed a gun to her head. He held the gun in his left hand. Defendant forced Maples to the back of the store behind the counter and said something like, "Don't push any damn buttons. Load up the goods." Deighton raised her hands over her head. Broome walked over and stood in front of Deighton.

Defendant forced Broome, Deighton, and Stamm to the corner of the store where the safe was located and demanded that Broome produce the keys to the safe, saying, "Come on man, I know you've got the keys." Stamm testified that defendant "was waving [the gun] around, but he kept it on [Maple's] head most of the time." Broom had his hands in the air. Deighton testified that Broome told defendant he did not have the keys but that defendant should "take the girl's keys." Broome was "saying, 'Just calm down, we'll give you what you want.' " Then, Stamm testified, defendant pulled the hammer of the gun back until it clicked and pulled the trigger. He shot Broome in the chest from a range of three to four feet. Both Deighton and Stamm testified that Broome had offered no resistance, made no sudden moves, and kept his hands raised.

Broome fell to the floor and began moaning. Deighton heard him say over and over, "Oh, my God. I have been shot. I'm dying. Please help me. It hurts." During this time, defendant continued to hold Maples around the neck and wave the gun back and forth at everyone. Stamm testified that defendant "was still insisting for jewelry, and so we couldn't go to Mike and help him. [Defendant] was still saying, 'Give me everything you have, give me everything.' " Stamm started removing jewelry from the diamond case and throwing it to defendant. Some of the jewelry fell to the floor.

3

Martin You, who owned a video store next door, heard a loud sound and, thinking a shelf might have fallen in the jewelry store, ran to see if Broome needed help. Through the window, he saw defendant holding a gun on a customer and realized the sound had been a gunshot. In order to distract defendant, You kicked the stopper holding the front door open, causing the door to close. Defendant turned when he heard the sound and saw You. You saw defendant "eye to eye" and got a good look at him before You ran back into his store. Defendant turned, shoved Maples away, and moved toward the front door. Stamm testified that defendant "was trying to grab at the ground, and I wasn't sure if he got anything. He was grabbing at the ground. And then he immediately ran . . . out of the store." Deighton fled out the back door and ran to a nearby flower shop where she called 911. Stamm pushed the store's silent alarm buttons and called 911.

Kari Machado, who had parked her car a few doors from the jewelry store, heard the gunshot. She looked in the direction of the sound and saw defendant run from the jewelry store.

Timothy Waldon, Christopher Church, and Christopher White were on the sidewalk about two stores down from the jewelry store. Waldon heard a loud sound and looked around to see what had caused it. He saw a man run out of the jewelry store and into the parking lot. Waldon and Church followed the man and saw him enter a vehicle. After about 30 seconds, the vehicle pulled away. Waldon and Church observed the number on the vehicle's license plate. Later Church gave that number to White, who wrote it down. It was 1DNC734.

Around 5:15 p.m., just after the crime was committed, Joann Stone, an off-duty deputy sheriff who happened to be driving nearby, observed the vehicle in which defendant had fled the shopping center. It was "going too fast for the traffic." The vehicle swerved around several cars by going into the emergency lane, then veered across three lanes and began tailgating a car in the left lane. The car quickly changed lanes again, cutting off another car, then veered back into the left lane and stopped for a red

light in the left turn lane. Deputy Stone pulled in behind the car and followed it as it turned left and then, a short distance later, left again into the Shadowridge Woodbend apartment complex. It parked in space No. 72.

Deputy Stone observed defendant leave the car, walk to apartment No. 113, and appear to be "trying the door." She stopped a short distance away and wrote some notes, including the car's license plate number, 1DNC734. Then she drove back past the apartment just as defendant was leaving. Defendant had changed his clothes. He had entered the apartment wearing a dark jacket and exited wearing a white long-sleeved sweatshirt. Deputy Stone left the apartment complex and drove back toward the shopping center, where she saw emergency vehicles. She spoke to a fellow deputy sheriff and learned that the vehicle she had followed had been involved in a crime. Deputy Stone relayed her observations to the sheriff's dispatcher over the radio.

Jeannine Angelo lived in the Shadowridge Woodbend apartment complex. Around the time of the crime, she heard sirens and stepped outside her apartment. She saw defendant walking down an embankment through some ivy near the laundry room. He stopped near a wall, bent down, and then straightened. After he stood up, defendant noticed Angelo, and they looked at each other for a moment. Angelo smiled at defendant, but defendant "just looked kind of frightened." Defendant turned and walked back up the hill through the ivy. As defendant left, Angelo noticed police officers arriving. She told the officers what she had seen and showed them the spot in the ivy where defendant had bent down. The police found in the ivy three gold bracelets that Deighton and Stamm testified defendant had taken during the robbery.

Around 5:30 p.m., that day, several sheriff's deputies responded to the Shadowridge Woodbend apartment complex. They observed defendant come out of apartment No. 113 carrying a laundry basket containing clothes. Deputy Donald Phelps testified that defendant was wearing a shirt that appeared "fresh," as if he had just put it on.

5

Michael Broome had stopped breathing by the time paramedics arrived at the jewelry store. He died of a single gunshot wound through his chest from a .44 caliber bullet manufactured by Remington.

Decker, Arlich, Swihart, Black, Deighton, Stamm, Machado, Deputy Stone, and Angelo all selected defendant from a live lineup and positively identified him at trial as the man they had observed that day. Decker, Deighton, Stamm, and Machado had previously selected his photograph from a photographic lineup. Angelo had previously identified defendant when he was sitting in the back seat of a police vehicle shortly after the crime. Waldon "tentatively" identified someone other than defendant at the live lineup as the man he saw run out of the jewelry store. Machado testified she had gotten a good look at the person she observed and was certain it was defendant. At the live lineup, she immediately identified defendant when he walked out, but later she crossed out her choice and chose someone else. As soon as she left the room she realized that her first choice was correct. Then she selected defendant again. When shown a photographic lineup, You pointed to a photograph of defendant and of another man "and stated that he was not sure when asked whether he could identify the person that he had seen inside the jewelry store on May 6, 1992." But he identified defendant from the live lineup, and at trial he was certain defendant was the gunman.

The prosecutor played for the court a videotape recording of the crime taken by the store's security camera, which consists of a series of still photographs. Deighton described what was occurring while the tape was playing. The tape indicated that approximately one minute elapsed from the time defendant entered the store to the time he left.

The parties stipulated that defendant had been residing at apartment No. 113 for over three weeks with his girlfriend, Kelly Tapp, and others. The apartment was leased to Byron Summersville and Jennifer Tapp, Kelly's sister. It was no longer

6

Summersville's primary residence, but he was a frequent overnight visitor. Evidence established that parking space No. 72 was assigned to that apartment.

Deighton, Stamm, and Deputy Stone all identified a black nylon jacket and a shirt or sweatshirt bearing a San Diego State University logo, both found inside apartment No. 113, as similar to the jacket and shirt defendant was wearing when they observed him or, in Deputy Stone's case, when she first observed him before he changed his clothes. Deighton identified a pair of pants bearing the label "Guess," also found in that apartment, as similar to the pants defendant wore. Machado identified the jacket as similar to the jacket defendant wore when she saw him. Aldrich identified the shirt as similar to the shirt defendant wore when she saw him.

The parties stipulated that Summersville owned the car that defendant drove from the crime scene to apartment No. 113, a blue 1982 Oldsmobile with the license plate No. 1DNC734. A gold bracelet taken during the robbery was found between the car's two front seats. A "semi-jacketed cartridge" stamped ".44 Remington Magnum" was found under the car's right front seat. It was similar to the bullet that killed Broome.

Deighton, Machado, Waldon, Decker, Swihart, Black, Deputy Stone, Angelo, and Stamm were shown photographs of Byron Summersville and stated he was not the man they saw the day of the crime. Denise Larson, who lived in apartment No. 114, directly above apartment No. 113, testified that shortly after the robbery, she observed defendant as he was leaving his apartment. She had seen Summersville around apartment No. 113 on several occasions, but he was not the man she encountered the day of the crime.

Gunshot residue was found on the jacket, the sweatshirt, a green and white shirt, and the pair of jeans with the "Guess" label, all of which were found in apartment No. 113, and on the shirt Deputy Phelps observed defendant wearing when he emerged from apartment No. 113. Material taken from defendant's hands at 11:45 p.m. the evening of the crime was also tested for gunshot residue, with negative results. A criminalist testified it would not be surprising if gunshot residue was not found on someone's hands

7

six and a half hours after that person had fired a gun.  For example, if that person had washed the hands in the interim, gunshot residue would not be found.

Summersville's fingerprints were found on his car.  Defendant's fingerprints were not found on that car or inside the jewelry store.  The gun used in the crime was never recovered.  Defendant is left-handed; Byron Summersville is right-handed.

### B.  Penalty Phase

Without objection, the prosecution introduced into evidence a certified copy of Michael Broome's autopsy report.  Additionally, three members of Broome's family and the three surviving victims of the robbery testified (one by stipulation) about the crime and its impact on the victims.  (See pt. II., D., *post*.)

Without objection, the defense introduced into evidence two reports by psychiatrists and one by a clinical psychologist.  The parties stipulated that "Byron Summersville is a violent and vicious person" and, if called to testify, witnesses would testify that he had stabbed a man in the chest and arm without provocation on December 8, 1992, and raped a woman on September 4, 1992.  The parties further stipulated that, if called to testify, San Diego Deputy Sheriff John Cherry would testify he knows Summersville to have a reputation for viciousness.

Defendant's mother, Catalina Weaver, testified that defendant was born on July 16, 1968.  He had two older brothers and a younger sister.  Defendant's parents raised him in Inglewood, and he had a normal childhood.  An album was introduced that included photographs of defendant from the time he was an infant.  From a young age, defendant sang in the church choir where his father had been the pastor and later played piano and organ for the choir.  Defendant was active in school and was good at sports, especially basketball.  He received grades of "B's and C's" until high school, when he stopped attending classes.  Defendant continued to attend church, however, and remained involved in the choir.  Defendant's father was an unpaid pastor.  His parents supported

the family by running a bookkeeping business. Defendant would help his mother pick up employment records and deliver payroll checks to small businesses.

Defendant had a daughter, Kayla, with Kelly Tapp in 1990. In 1992, Kelly and his daughter moved in with Kelly's sister in Vista. Defendant had been unable to find a job in Inglewood. Byron Summersville told him he could get a job in Vista where Summersville was working, so defendant moved to Vista.

Nancy Simmons testified that she became defendant's friend nine years previously when she was 12 years old. She described defendant as "a very caring person" who loves the church and loves to play music. She never saw defendant act violently.

Benroy Lillie testified that he was the pastor of the Greater Faith Baptist Church in Houston, Texas. Beginning in 1980, defendant sometimes accompanied his father to Houston where his father would preach in Pastor Lillie's church. Pastor Lillie also traveled to Inglewood and preached in defendant's father's church. Pastor Lillie described defendant as "very quiet and very respectable" and was impressed by defendant's "dedication to the worship."

Alex Hubo met defendant when they attended Job Corps several years earlier. Hubo never saw defendant act in a violent manner. Defendant was a good friend who supported Hubo when his mother died and played music at her memorial service. Another friend, Cynthia Moultrie, described defendant "as caring and loving and giving." She never saw him use drugs or alcohol or engage in a violent confrontation.

Steven Lynch met defendant at church when they were children and later played bass guitar with him for the choir. Defendant was a "peaceful person" who "[a]lways cared about his family and his friends." Lynch's mother, Loretta Lynch, worked in the Weaver family's bookkeeping business and was a member of the church choir. She had known defendant for 20 years and described him as "a giving person" who had a close relationship with his daughter. She never saw him act violently.

9

Mae Bush was a vocational orientation specialist with emphasis on attendance at Hillcrest Continuation High School when she became aware that defendant was not attending high school regularly. She met with defendant and his parents and then met regularly with defendant to encourage him to attend high school. Defendant was quiet. It was clear he came from a Christian home. He did not associate with gang members. Defendant's attendance problems stemmed, in part, from the fact that "academically [he] did not have many of the necessary skills to pass the courses." Bush accepted defendant's invitation to hear him perform with the choir and subsequently became actively involved with the church. She described defendant as "happy," "cheerful," and "kind of playful." She never knew him to be involved with drugs or alcohol. She could not believe it when she learned he had been charged with a crime because she had "never known him to be violent or even aggressive."

Clee Morris was the president of the choir and had known defendant for most of his life. Defendant was a talented musician and never was "real rowdy." Pam Wade was the vice-president of the choir and had known defendant for 10 years. Defendant played piano and organ and attended every rehearsal and service. Wade described him as "an inspiration to anyone that comes in contact with him because he just has that kind of personality." Mearce Morris, a member of the same church who had known defendant for most of his life, described defendant as a "very giving, respectful young man." She never saw him use drugs or alcohol. Defendant's aunt, Corine Smiley, testified that she never saw defendant act violently and described him as "a very calm, nice, respectable guy."

Madeena Jenkins was an employee at the Weaver family's bookkeeping business, was actively involved in the church, and had known defendant most of his life. She helped defendant with his homework and taught him to play the piano. Defendant played piano "by ear" and never learned to read music. She never saw defendant act violently.

10

Ray Weaver, Sr., defendant's father, was the pastor of the Southern Missionary Baptist Church and managed a bookkeeping service and a body shop. Defendant had trouble reading, but from a young age he showed a talent for studying Scripture, which his father described as a "spiritual gift." Defendant's father nurtured that interest by condoning his missing school to be at the church. He preferred defendant to "be a strong Christian than to be an educated fool."

Alex Love testified that defendant had been his cellmate in the Vista jail for six months. He once found defendant crying, saying , "I feel for the bereaved family."

Analysis of a blood sample withdrawn from defendant just after midnight on the night of the crime revealed a blood alcohol level of .05 percent. An expert in blood-alcohol absorption rates extrapolated that defendant would have had a blood-alcohol level of .17 percent at 6 p.m. that evening.

Dr. Charles Rabiner, a psychiatrist, interviewed defendant twice in the Vista jail and reviewed various records. In the first interview, defendant denied having committed the crime. In the second interview, defendant admitted the crime. He explained that he had been drinking beer with Byron Summersville and Summersville suggested the robbery. They went to a hardware store to purchase supplies, including bullets for Summersville's gun. Summersville gave defendant the gun and told him to enter the store first and Summersville would be right behind him. Defendant was very nervous and wondered whether he should enter the jewelry store, but he did not want Summersville to "think less of him if he backed out." Defendant entered the store, took a hostage, and ordered everyone to lay on the floor. He heard someone enter the door, but was surprised to see it was not Summersville and, at that point, the gun went off. Defendant said he did not know how the gun discharged and did not remember pulling the trigger. Defendant got scared, grabbed some of the jewelry, and ran. Defendant denied intending to hurt anyone and appeared to Dr. Rabiner to be genuinely remorseful.

11

Dr. Rabiner concluded that defendant did not suffer from "a major mental illness." He had "a mixed personality disorder with dependent and histrionic features," which means he "frequently depended upon others to make up his mind for him . . . [and] had a low sense of self confidence." Dr. Rabiner "doubted that he had the capacity to clearly plan a burglary, obtain a weapon and plan the escape route. . . . [I]t seemed much more likely that he was told what to do by someone else, as he is easily influenced by others." Defendant's verbal IQ was measured at 76, which is borderline retarded.

In rebuttal, Mary Deighton testified that defendant seemed fully coordinated, kept his balance, and did not slur his words during the robbery. Until after he shot Broome, defendant never looked over his shoulder, and no one else ever entered the store. Defendant was facing Broome when he shot him. He "cocked [the gun], and then he pulled the trigger with a pause of maybe, at the most, a second" before he did so.

Deputy Phelps, who observed defendant emerge from apartment No. 113 and spoke with him shortly after the crime, and who had received training regarding persons suspected of driving under the influence of alcohol, testified that defendant gave no indication of being under the influence of alcohol.

## II. DISCUSSION

### A. Jury Trial Waiver

Defendant contends his waiver of a jury trial was invalid because (1) he was not advised of "his right to appeal the denial of the pretrial motions," (2) he was not advised of his "right to participate in the selection of his jury," and (3) he "never made a separate and express . . . waiver of his right to a jury trial on the special circumstance allegations."

#### 1. Factual Background

On February 16, 1992, defendant filed a motion challenging the composition of San Diego County juries. The court denied the motion on February 24, 1993. Defense counsel then stated, "I have spoken with Mr. Weaver about this, and he would like to

waive jury in this case." The court continued the matter to permit the prosecution to decide whether to agree also to a jury waiver.

On February 26, 1993, defense counsel reiterated that defendant wished to waive his right to a jury "[b]oth as to guilt and penalty if we get there." The prosecution agreed to the waiver, with the condition that defendant would waive his "appellate rights regarding certain pretrial motions that have been litigated." He noted that the parties had litigated "a good many motions in this case, many of which, most of which pertain in fact to a jury trial as opposed to a court trial." The court advised the prosecutor that, in light of this court's decision in *People v. Stanworth* (1969) 71 Cal.2d 820, defendant's waiver of his appellate rights might "be meaningless on the automatic appeal, and the California Supreme Court may well yet indulge themselves into a microscopic examination of the court's and counsel's performance on the challenge to the jury panel and the other motions we have had." Despite the court's warning "that the conditions you are asking may not curtail the California Supreme Court's appellate review," the prosecutor agreed to a court trial.

Defense counsel clarified that defendant was willing to "waive his appellate rights as to pretrial rulings, but he is not waiving his right to appeal from, for example, rulings during the yet to come trial in his case." The prosecutor then listed 19 pretrial rulings that defendant agreed not to appeal, many of which related to issues that would arise only if a jury were empanelled. Defense counsel explained, "[W]e are agreeing to waive our right to appeal from the court's pretrial rulings on these various motions. . . . [M]ost of them apply to matters that would only be relevant in a jury trial. But there were a few of them that apply to, for example, evidentiary matters. . . . [I]t is the understanding of the parties that as the forthcoming trial progresses that we are going to be permitted to interpose objections and would have a right to appeal from the court's rulings at trial regarding those issues."

13

Defendant executed a two-page written waiver of his right to a jury trial stating that defendant "does desire to waive and give up his right to a trial by jury and that he does desire to have this court sitting without a jury determine whether he is guilty or not guilty of the offense(s) for which he is charged . . . ." The form, which was signed by defendant and his counsel, stated that defense counsel "has fully explained" to defendant the terms "jury trial" and "court trial" and the "difference between a 'jury trial' and a 'court trial.' " Defendant and his counsel also signed a one-page waiver of his right to a jury at the penalty phase that stated, in part, "If, at the guilt phase, [defendant] is found guilty of first degree murder and a special circumstance is found true . . . he does desire to waive and give up his right to a trial by jury and that he does desire to have this court sitting without a jury determine whether he will be sentenced to life without the possibility of parole or death . . . ."

In open court, the court acknowledged the written waiver forms executed by defendant and his counsel and stated that "a waiver of jury is a waiver of jury on all of the triable issues before the court." The court explained to defendant that during the guilt phase of the trial the court would determine "whether or not the People prove their case beyond a reasonable doubt [which includes] a first degree murder charge along with the proof of a special circumstance, along with the other charges that the People have pled, the burglary, robbery charge, et cetera. If you waive jury, the court will determine all legal findings required in that phase of the trial." Later, the court again stated that in order for the case to proceed to the penalty phase, the "findings that would be required [would be] first degree murder and a special circumstance, both beyond a reasonable doubt."

The court also explained to defendant a number of differences between a court trial and a jury trial. It explained, for example, "if you have a jury trial . . . you have an absolute right to have the jury be unanimous. Meaning that all 12 jurors would have to agree to a decision." Defendant stated he understood. The court also explained that

14

defendant was "entitled to have twelve citizens of the community impaneled and sworn to try this case, to determine by their verdict" whether he was guilty. Defendant stated he understood. Defendant also stated on the record that his attorney had fully explained to him the terms, "jury trial," "court trial," and the difference between the two. One of his attorneys stated that he, the other defense attorney, defendant, and defendant's father had discussed the matter together the day before for about two hours, and that the attorney believed waiving a jury was in defendant's best interest. Defendant said he agreed with what his attorney had just said.

Later, the court asked defendant if he understood that "by waiving your right to have a jury trial, you are doing so with the awareness that I will do everything that a jury could do in such a case?" Defendant said he understood. Defendant expressly waived his right to a jury trial and defense counsel expressly concurred in defendant's waiver. The court found that defendant's waiver was knowing, intelligent, and voluntary and was "an appropriate waiver of jury for all purposes in this case."

Following the guilt verdict, the parties, including defendant personally, signed a further written jury waiver that stated in part, "It is also the intention and reaffirmation that the defense and prosecution furthermore separately recognize their right to a jury trial on the special circumstances finding and also fully waive their right to jury trial on the special circumstances finding." The court noted on the record that when defendant had waived his right to a jury prior to trial, it "very carefully pointed out that the defendant was waiving jury for all purposes and all findings in front of the court. . . . Nonetheless, the court feels that it is worthy of reaffirmation that that's exactly what everyone intended to do . . . ."

The court also explained it would permit either side to withdraw its waiver of a jury penalty trial. It called a recess to permit the parties, including defendant personally, to reconsider whether to waive a jury for the penalty trial. After the recess, defendant personally reiterated that he had waived a jury for all purposes, including the special

15

circumstances, and said he still wished to waive a jury for the penalty phase. The two defense attorneys said they agreed.

### 2. Analysis

"A defendant in a criminal prosecution has a right to a trial by jury under both the federal Constitution [citation] and our state Constitution [citation]." (*People v. Ernst* (1994) 8 Cal.4th 441, 444-445.) However, "[a] jury may be waived in a criminal cause by the consent of both parties *expressed in open court by the defendant and the defendant's counsel*." (Cal. Const., art. I, § 16, italics added; see *People v. Ernst*, *supra*, at p. 445.) These requirements were satisfied in this case; defendant expressly waived his right to a jury both in writing and in open court, and defense counsel expressly concurred both in writing and in open court.

To be valid, a defendant's waiver of the right to a jury must also be "knowing and intelligent, that is, ' " 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it,' " ' as well as voluntary ' " 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' " ' [Citations.]" (*People v. Collins* (2001) 26 Cal.4th 297, 305.)

First, defendant argues that his waiver was invalid because he was not advised and did not understand that the prosecution had required his counsel to waive his right to appeal 19 pretrial rulings in order for the prosecution to agree to waive a jury. The record belies this argument. There was a long and detailed discussion in open court in defendant's presence of the condition the prosecution imposed on its agreement to waive a jury, during which the prosecutor listed all 19 pretrial rulings defendant agreed not to appeal. This discussion in defendant's presence adequately informed him that his counsel agreed not to appeal those pretrial rulings.

16

It is unclear to what extent the waiver would in fact have limited the issues defendant could have raised.  In capital cases, the defendant may not entirely waive the right to appeal.  As the trial court noted, article VI, section 11, of the California Constitution provides that "[t]he Supreme Court has appellate jurisdiction when judgment of death has been pronounced."  Section 1239, subdivision (b) provides that when "a judgment of death is rendered, an appeal is automatically taken by the defendant without any action by him or her or his or her counsel."  This statute "imposes a duty upon this court 'to make an examination of the complete record of the proceedings had in the trial court, to the end that it be ascertained whether defendant was given a fair trial. . . .' " (*People v. Stanworth*, *supra*, 71 Cal.2d at p. 833.)  "We cannot avoid or abdicate this duty merely because defendant desires to waive the right provided for him."  (*Ibid.*)

In any event, it does not appear that defendant's agreement not to appeal certain pretrial rulings had any practical effect.  Many of the rulings related to issues that would arise only if a jury was selected and were thus rendered moot when the parties agreed to a court trial.  As to the remaining rulings, nothing in the record indicates that defendant wished to raise any of these issues on appeal but was barred by his agreement.  He certainly retained the right to raise issues pertaining to the contested court trial, and he has done so in this appeal.

Second, defendant argues that his waiver was invalid because he was not advised of, and did not surrender, his right to participate in selecting the jury.  He recognizes that this court never has required such an advisement, but he relies on several federal court decisions that, he contends, impose such a requirement.  (*U.S. v. Gonzalez-Flores* (9th Cir. 2005) 418 F.3d 1093, 1102-1103; *Spytma v. Howes* (6th Cir. 2002) 313 F.3d 363, 370; *U.S. v. Robertson* (10th Cir. 1995) 45 F.3d 1423, 1432; *Marone v. U.S.* (2d Cir. 1993) 10 F.3d 65, 68; *U.S. v. Rodriguez* (7th Cir. 1989) 888 F.2d 519, 527.)  These decisions do not persuade us to adopt defendant's proposed new rule.

17

In *U.S. v. Gonzalez-Flores*, *supra*, 418 F.3d 1093, the court suggested that "[t]o ensure that a [jury] waiver is voluntary, knowing, and intelligent, the district court should: inform the defendant that . . . (2) the defendant may take part in jury selection . . . ." (*Id*. at pp. 1102-1103.) The court added, however, that it had "declined 'to impose an absolute requirement of such a colloquy in every case' . . . ." (*Id*. at p. 1103.) In *Spytma v. Howes*, *supra*, 313 F.3d at page 370, the court observed that "[a] defendant is deemed to be 'sufficiently informed to make an intelligent waiver if he . . . [knows] he may participate in the selection of jurors' . . . ," but it added that "there is no federal constitutional requirement that a court conduct an on-the-record colloquy with the defendant prior to accepting the jury waiver." The court in *U.S. v. Robertson*, *supra*, 45 F.3d at page 1432, "strongly urge[d] district courts personally to inform each defendant of the nature of jury trials on the record before accepting a proffered waiver," including informing defendants that "the defendant may take part in jury selections." But it did not actually impose such a requirement. Similarly, in *Marone v. U.S., supra*, 10 F.3d at page 68, the court urged but did not require trial courts to inform defendants they may participate in jury selection.

The opinion in *U.S. v. Rodriguez*, *supra*, 888 F.2d 519, also does not support defendant's position. The appellate court said that as part of an interrogation to ensure the defendant understands the right to a jury trial and the consequences of a waiver, the trial court " 'should explain . . . that the defendant may participate in the selection of jurors . . . .' " (*Id*. at p. 527.) The district court did not so advise the defendant. Rather, he signed a written jury waiver, the court advised him that he had " 'a right to have a jury determine the facts in this case,' " and the court asked him whether he was " 'willing to give up that right and have me determine the facts in this case?' " (*Ibid*.) The appellate court found this sufficient: "There can be no doubt that [the defendant] knew that he was relinquishing his right to trial by jury. Knowing more of the details of the jury process might facilitate an astute decision about whether to waive or stand on his rights, but a

decision need not be wise to be voluntary. Defendants also might benefit from understanding the special dynamics of a jury trial — that the trial will be more formal, that the rules of evidence will be more strictly enforced, that counsel will make flamboyant appeals to the jury that they would not dream of pitching to a judge, and so on. Yet such information is not an essential ingredient of a waiver." (*Id*. at p. 528.)

As can be seen, even the federal cases do not impose, as an absolute requirement, the rule defendant urges. We decline to impose it. In this case, the court and defense counsel fully explained to defendant what he was waiving. One can always think of new things to argue a court should explain while taking a jury waiver, but the thorough explanation given here was more than adequate to ensure that defendant's waiver was sufficiently informed.

Third, defendant argues that even if the jury waiver was valid as to guilt, it was invalid as to the special circumstance allegations because he did not separately waive his right to a jury trial on the truth of those allegations. It is clear he has that right both under the Sixth Amendment to the United States Constitution (*Ring v. Arizona* (2002) 536 U.S. 584, 589 [the Sixth Amendment jury trial right includes the right "to a jury determination of any fact on which the legislature conditions an increase in [capital defendants'] maximum punishment"]) and under California law (*People v. Memro* (1985) 38 Cal.3d 658, 700-701). In arguing the waiver was invalid as to the special circumstance allegations, defendant relies on *People v. Memro*, *supra*, at page 704, where we held "that an accused whose special circumstance allegations are to be tried by a court must make a separate, personal waiver of the right to a jury trial."

In *People v. Diaz* (1992) 3 Cal.4th 495, we explained what was required for a "separate" waiver of the right to a jury trial. Diaz had been advised that that he would be " 'giving up that right to have the jury in two different functions. First of all, first function is to decide the question of your guilt or innocence. Then the second function, similarly, . . . you would have 12 jurors who must unanimously agree as to the

19

punishment. . . . And you'll be giving up that right.' " Defendant answered, " 'I'm giving it up' " and acknowledged that he understood that his waiver applied " 'to both phases . . . of the special circumstances case.' " (*Id*. at p. 564.) We held this was sufficient, explaining: "The waiver must be made by the defendant personally, and must be 'separate' — that is, if the defendant is to be deemed to have waived the right to jury trial on both guilt and special circumstances, the record must show that the defendant is aware that the waiver applies to each of these aspects of trial." (*Id*. at p. 565.) This test was satisfied in *Diaz* because the defendant was told that "the waiver of his right to trial by jury applied to *all* aspects of his special circumstances case, from beginning to end," and defendant stated that he had discussed the matter " 'quite thoroughly' with his counsel." (*Ibid*.)

In *People v. Wrest* (1992) 3 Cal.4th 1088, we found a sufficiently separate waiver when the defendant was advised that his right to a jury trial included " 'any other special allegations that are charged in this particular case' " and was told that, in a jury trial, all 12 jurors would have to agree on the special circumstances. (*Id*. at p. 1103, italics omitted.) The defendant then waived his right to a jury trial as to the " 'special allegations that we've already talked about' " and agreed that he did not " 'want a jury trial on the issue of guilt or the special circumstances.' " (*Id*. at p. 1104, italics omitted.) We held that the record "reflects an express and personal understanding and waiver of appellant's right to jury trial on the special circumstance allegations. The mere fact that the prosecutor's questions combined issues of guilt, special circumstances, and enhancements did not vitiate the waiver." (*Ibid*.) We explained that *People v. Memro*, *supra*, 38 Cal.3d 658, did not require "a separate interrogation of defendant about his special circumstance jury trial rights as distinct from his other jury trial rights. . . . It simply requires that a valid waiver of the jury-trial right on a special circumstance actually cover the special circumstance. It does *not* require such a waiver to be taken in accordance with any particular procedure." (*People v. Wrest*, *supra*, at p. 1105.)

20

In this case, the record demonstrates that defendant's jury waiver included the special circumstance allegations. The written waiver regarding guilt that defendant and his counsel signed did not specifically reference the special circumstance allegations. But in the oral proceedings, the court advised defendant that "a waiver of jury is a waiver of jury on all of the triable issues before the court." It explained to defendant twice that these issues included the special circumstance allegations. Additionally, the written waiver as to penalty, which defendant and his counsel also signed, expressed defendant's desire to waive a penalty jury if, at the guilt phase, he was "found guilty of first degree murder *and a special circumstance is found true*." (Italics added.) It was defendant who first indicated the desire to waive a jury, and the court gave him ample time to consider and reconsider his decision and to discuss it fully with counsel. Defendant understood and intended his waiver to include both guilt and special circumstances as well as, if it came to that, the penalty determination. To require more, or to mandate a different procedure, would exalt form over substance.

Any possible doubt in this regard — and there was none — would have been removed when, after the guilt verdict, defendant reiterated that he had waived a jury as to special circumstances. Reiterating the waiver made sense even at that late stage. A separate trial on the special circumstances would have been pointless. Once the trier of fact — whether jury or court — found that defendant murdered Broome, the special circumstance allegations necessarily followed. No credible argument existed that the person who killed Broome did not do so during the course of a robbery and a burglary. It would have been absurd to waive a jury as to the murder charge but not as to the truth of the special circumstance allegations.

Finally, defendant stated he wished to continue to waive a jury as to penalty even after the guilt and special circumstance verdict. At all times, defendant understood, and intended, that his waiver of a jury trial was for all purposes.

21

The court was exceptionally careful in taking defendant's jury waiver. That waiver was knowing, intelligent, and voluntary in all respects.

## B. Alleged Prosecutorial Misconduct

Defendant claims the prosecutor committed misconduct during closing argument in the guilt phase of the trial.

In his opening argument, the prosecutor summarized the evidence, including the numerous eyewitness identifications of defendant, both in court and at photographic and live lineups, the fact that the perpetrator had fled the scene of the crime in a car that belonged to the person who had leased the apartment in which defendant was residing, the fact that an off-duty deputy sheriff had followed defendant as he drove that car from the crime scene to his apartment where he was arrested a short time later, and the fact that defendant had been seen near his apartment disposing of jewelry taken during the robbery. In response, defense counsel cited numerous small errors and inconsistencies in the testimony, pointed out the lack of physical evidence corroborating the eyewitness identifications, noted that the prosecutor bore the burden of proof, and argued that there was reasonable doubt of defendant's guilt.

The prosecutor began his closing argument by stating, "[A]s I sat here listening to counsel, I kept waiting. I kept waiting. I kept waiting for the answer that I think the court was probably waiting for from the defense, and that was, well, if it wasn't La Twon Weaver, just who the heck was it? Who was it?" Defendant did not object at this time. Later, the prosecutor stated, "Your honor, I think it is clear from the evidence in this case that La Twon Weaver executed Michael Broome. I don't think there is any doubt. And again I kept waiting for [defense counsel] to offer this court some alternative, some — I suppose we just have this some other third person who committed this crime. The court has been offered absolutely no alternative, nor could they offer —" Defendant objected that "[t]he prosecution is attempting to shift the burden of proof which, of course, is

22

forever upon them." The court responded, "The court is well aware all elements remain as to the burden of proof on the People, but it is an argument of fact, so he may comment."

When the penalty trial was concluded, the court took the matter under submission. Later, it found defendant guilty as charged. The court recounted the evidence in detail and concluded, "From a logical analysis of the evidence there is no other person who could have done all the defendant was seen and proven beyond a reasonable doubt doing who could have committed this crime. It is undisputed that Michael Broome was shot and killed during an armed robbery. There is no doubt. And there is no reasonable doubt at all that the defendant is the person who committed the robbery and the burglary . . . ." The court stated, "After the court conducted a careful analysis of all of the evidence, and a review of the applicable law, the court felt there was no doubt as to the verdict, let alone a reasonable doubt. The evidence was in sum total overwhelming that the defendant is guilty of the charges, and the special circumstances, and the allegations."

Defendant argues that the prosecutor's argument shifted the burden of proof to defendant by suggesting that defendant "must provide affirmative evidence of his innocence, not just raise a reasonable doubt." We disagree.

In the context of a jury trial, we have held that "it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall* (1996) 13 Cal.4th 799, 831.) The prosecutor did not violate this rule. He did not say that defendant bore the burden of proof or that defendant was required to produce evidence. He merely said he was waiting for defense counsel to explain, in light of the evidence, how someone other than defendant could have murdered the victim. He argued that, although there were some inconsistencies or gaps in the prosecution's case, the evidence unerringly led to only one reasonable conclusion — that defendant was the only person who could have committed the crime. It was not

23

misconduct to observe that defense counsel had failed to explain how this evidence could be reconciled with the conclusion that anyone other than defendant had committed the charged offenses. The prosecutor permissibly commented on the state of the evidence. (*People v. Taylor* (2010) 48 Cal.4th 574, 633.)

Moreover, this was a *court* trial. There was no jury to be misled. We are confident the court fully understood who had the burden of proof in this criminal action. Indeed, in overruling defendant's objection, the trial court stated that it was "well aware" that the People bore the burden of proving "all elements" of the charged offenses. It could not have been misled to defendant's prejudice.

## C. Cumulative Guilt Phase Error

Defendant claims the cumulative effect of the asserted errors was prejudicial. But there was no error to accumulate.

## D. Victim-impact Evidence

Defendant argues that the judgment of death must be reversed because the court erroneously admitted and considered victim-impact evidence.

### 1. Factual Background

Before trial, on December 15, 1992, the prosecution filed an amended notice of evidence in aggravation under section 190.3. The notice listed 13 possible victim-impact witnesses, "not all of whom are expected to testify in line with limitations imposed by the court and acknowledgment that some testimony may be cumulative." Defendant objected and asked the court to exclude evidence "as to the emotional effect of the death of the victim on the family, friends and relatives." The trial court overruled the objection, ruling that "the 8th Amendment does not prohibit victim impact evidence." It denied defendant's motion to limit victim-impact witnesses to those who had witnessed the murder. Concerning the number of victim-impact witnesses, the court promised it would "strike [a] careful balance," noting that "certainly you can't fix on a mechanical number,

24

but it would certainly seem that a few would be reasonable and that a lot would be unreasonable." Before defendant waived his right to a jury trial, the court indicated that it "intend[ed] to be extremely vigilant on not only the cumulative effect of any such victim impact evidence, but also . . . under [Evidence Code section] 352 to make sure that although it is legal and permissible within limits, that those limits be very strongly safeguarded by the court . . . . And yet as the court points out it, is certainly relevant to have some impact evidence under today's law."

After the jury waiver, at the beginning of the penalty phase, defendant renewed his objection to victim-impact testimony from witnesses who had not been present at the scene of the crime. The court treated it as a motion for reconsideration and denied it, reaffirming that victim-impact evidence would be permitted, but it "would be limited so that there would not be any unreliability or overly emotionally appealing issues that could sway any fact-finder from rationality." The court further observed that because the right to a jury had been waived, "[s]ome of the risks of an overly emotional and overly irrational response are somewhat protected in the sense that counsel on both sides are well aware that this court has been in this business over 14 years and has presided over vast numbers of homicides, and is less likely by any assessment to let the irrationality into an analysis of [victim-impact] evidence . . . ."

The court stated that it's denial of defendant's motion was "without prejudice for individual objection if there is a cumulative, overly repetitious or a pressure which falls outside the guidelines of the *Edwards* case." (*People v. Edwards* (1991) 54 Cal.3d 787.) Defense counsel asked, "As it relates to victim impact, in general, would the court consider that to be a continuing objection as the witnesses come on?" The court replied, "Yes, it may be a continuing objection. And the court — as it is continuing, the court intends to overrule it and does, but I will not overrule it if it's a specific objection if we enter into overindulgence . . . ."

Annette Broome, Michael's wife, testified that when he died, they had been married almost 13 years and had two children, 11-year-old Melissa and eight-year-old Michael. She displayed family photographs taken when they lived in New Jersey and spoke of the victim's work in the Middletown Chamber of Commerce. One reason they had left New Jersey was because it was becoming dangerous, and they wanted to move to a safer community.

On the day of the crime, Annette was home when the alarm company called to say that the store's panic button had been activated. The alarm company had telephoned the store but gotten no response. She drove to the store, but the police would not let her cross the perimeter they had established. She asked an officer to have her husband come out to speak to her, and the officer responded that he could not come out. Annette asked, "Is he dead?" and the officer nodded his head. She described how she told her children that their father had been killed and how their father's death had affected both children.

The victim was buried on what would have been his 35th birthday. Annette described the difficulty of informing her family that the victim had died and planning the funeral. Annette ran the jewelry store for several months, but then had to sell it because "the memories were too much." She described how she became fearful that she would be robbed or otherwise attacked and how her son did not want her to leave the house. She described the pain brought by holidays such as Father's Day and their wedding anniversary and the pain of reliving these events by attending the trial.

The victim's mother, Mary Broome, testified that she was grief stricken, needed to take tranquilizers to go to sleep, and felt she could not go on with her life. Joseph Broome, Michael's brother, testified that the victim was the eldest of four brothers and had cared for his siblings while their parents worked. The victim had been the president of the Chamber of Commerce in Middletown, New Jersey, and there was an outpouring of sympathy from the community. Joseph described telling his mother that Michael had been killed.

Lisa Maples testified she had gone to Shadowridge Jewelers on May 6, 1992 to have her ring repaired. Defendant grabbed her from behind, put a gun to her head, and forced her to the back of the store. Michael Broome told defendant, " 'we'll give you what you want, just calm down.' " Maples described herself as being "in shock" during the crime. Since then, she has had difficulty sleeping and suffers from nightmares. She and her husband used to run for exercise in the evening, but she had to purchase a treadmill because she was afraid to go outside. She is "very jumpy around people, very — I'm always looking behind my shoulder."

Mary Deighton testified that after defendant shot Broome, he ignored him and continued with the robbery "as if nothing had happened." Even when the victim was begging for help, defendant never looked in his direction. Defendant was "more hostile" towards Broome than towards the others. He displayed "hatred" for Broome. Deighton was a student studying management, and Broome had been a mentor and a friend. Since the crime, she has had anxiety attacks "once or twice a week," nightmares, difficulty sleeping, and took medication until she became pregnant. She sees a psychiatrist.

The parties stipulated that, if called as a witness, Lisa Stamm would testify that after the crime, she "has suffered ongoing psychological difficulties; has, in fact, on a continued basis undergone psychological counseling; she's afraid to go out at night; she has ongoing nightmares involving crimes of violence, frequently involving violence with a firearm specifically; and that she has frequent difficulty with sleep."

Counsel presented their closing arguments on Thursday, March 25, 1993. The court rendered its decision on Wednesday, March 31, 1993. It considered in mitigation that defendant was under the influence of alcohol and Summersville participated in planning the crime. But it also concluded defendant acted alone and without hesitation and deliberately cocked his weapon and shot at point-blank range "an unarmed, defenseless human, who [was] in the process of cooperating with your robbery demands and ha[d] his hands raised in complete submission." The court noted that "[n]othing

27

confirms the purposeful execution any more than the defendant's actions immediately afterwards. He continued waving the gun at other store clerks, kept ahold of the hostage until needing to release her to get the jewelry and leave. He continued in his demands without hesitation. He was completely unaffected by the purposeful shooting. . . . Nothing in the evidence suggests any accidental or reaction-type impulse shooting."

Regarding the victim-impact evidence, the court observed that "changes in this law permitting victim impact evidence permitted this court, and mandated this court, to give full consideration to such evidence." The court stated it "limited the amount of that that was receivable or admissible" and "considered only direct victim impact evidence which logically showed the harm caused by the defendant." "The court found none of the victim-impact evidence overly emotional, inflammatory . . . . It did not cause this court to react with a rash or purely subjective response. Indeed, this court has over fourteen years of judicial experience, is handling it's third capital case to go through a penalty phase, and has presided over forty homicide trials. This court was not overtaken by any reaction that would detract from reliability of the result based on victim-impact evidence."

The court found "that the aggravating factors in this case are of such monstrous weight and are so considerable that the appropriate penalty in this case is death." The court further stated, however, that "absent the strength and force of the extremely high level and heavy weight of [the victim-impact evidence], this court would have reached a different result."

### 2. Analysis

"In a capital trial, evidence showing the direct impact of the defendant's acts on the victims' friends and family is not barred by the Eighth or Fourteenth Amendments to the federal Constitution. (*Payne v. Tennessee* (1991) 501 U.S. 808, 825-827.) Under California law, victim-impact evidence is admissible at the penalty phase under section 190.3, factor (a), as a circumstance of the crime, provided the evidence is not so

28

inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1180.)

Defendant argues that the trial court erroneously believed that it was *required* to admit and consider victim-impact evidence. He reasons that the trial court had discretion to exclude all victim-impact evidence because *People v. Edwards*, *supra*, 54 Cal.3d 787, merely stated that "factor (a) of section 190.3 *allows* evidence and argument on the specific harm caused by the defendant, including the impact on the family of the victim." (*Id.* at p. 835, italics added.) The court here may well have believed it was required to admit and consider some victim-impact evidence. If so, the court was correct. We also said in *Edwards* that the court " '*should* allow evidence and argument on emotional though relevant subjects that could provide legitimate reasons to sway the jury to show mercy or to impose the ultimate sanction.' " (*Edwards*, *supra*, at p. 836, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 864, italics added.) Although the court must ensure that such evidence is presented within reasonable bounds, it may not exclude *all* such evidence. As noted, victim-impact evidence is admissible as a circumstance of the crime under section 190.3, factor (a). "[T]he trial court lacks discretion to exclude *all* factor (a) evidence on the ground it is inflammatory or lacking in probative value." (*People v. Box* (2000) 23 Cal.4th 1153, 1200-1201.)

Defendant also argues that the victim-impact evidence was unduly prejudicial due to its "sheer volume" and its "emotionally charged tenor and substance." Defendant forfeited this issue by failing to object on these grounds at trial. When it overruled defendant's general objection to victim-impact evidence, the trial court did so without prejudice to his objecting to specific items of evidence. Defendant did not object on the ground that the "sheer volume" of victim-impact evidence was improper or that any particular evidence was "emotionally charged" and, thus, may not raise these grounds for the first time on appeal. (Evid. Code, § 353; *People v. Brady* (2010) 50 Cal.4th 547, 576.)

Moreover, the claim lacks merit. In *People v. Taylor* (2001) 26 Cal.4th 1155, 1172, we held that victim-impact evidence was properly admitted because "[o]ur review of the record indicates the evidence was relevant and not so voluminous or inflammatory as to divert the jury's attention from its proper role or invite an irrational response." We reach the same conclusion here. The victim-impact testimony consisted of the testimony of three of the victim's family members and the three surviving victims present during the crime, one of whom testified by way of stipulation. Although some of the testimony was emotionally wrenching, it was not so extreme as to divert the experienced trial judge's attention from his proper role. The judge stated that he did not find the evidence "overly emotional [or] inflammatory," and it "did not cause this court to react with a rash or purely subjective response." "The evidence here came well within permissible limits and, indeed, was very typical of the victim impact evidence we routinely permit." (*People v. Valencia* (2008) 43 Cal.4th 268, 300; see also *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 986-987, 1057.)

Arguing to the contrary, defendant claims the victim-impact testimony "was unfairly prejudicial because of the absence of any aggravating evidence other than the circumstances of the crime." He points out that in *People v. Roldan* (2005) 35 Cal.4th 646, 732-733, we observed that "the jury heard evidence defendant had threatened the life of the prosecutor and stabbed a jail inmate" before we concluded that victim-impact evidence "from the surviving spouse, though no doubt possessing a strong emotional impact, was not overly inflammatory." But nothing in *Roldan* suggests that whether victim-impact testimony is admissible depends on whether the prosecution introduces other aggravating evidence.

Relying on Justice Moreno's concurring opinion in *People v. Robinson* (2005) 37 Cal.4th 592, 656-658, defendant argues some of the testimony was impermissible. In *Robinson*, a victim's father testified, " 'How can I ever escape the image of my son's terror as he defenselessly pleaded for his life and not by accident, not in anger, not in

30

fear, but for a few hundred dollars someone could look my son in the eye, and without feeling or mercy, in a point-blank range shoot him in the face, then put the gun against the side of his head and shoot him again.' " (*Id*. at p. 646 (maj. opn.).) Similarly, the mother of the other murder victim testified, " 'I can see James and what his terror must have been like in seeing his best friend shot. How afraid he must have been on his knees asking for his life. I can feel the gun to his head. . . . [¶] I don't understand anybody being able to do that. [¶] I can hear him moaning as he lay on the ground and bled from his wound and there wasn't anybody there to help him.' " (*Id*. at p. 649, fn. and italics omitted.) Justice Moreno, joined by Justice Kennard, expressed concern about such testimony and would have held "as a general rule that testimony of victims' friends and family regarding their imagined reenactments of the crime be excluded." (*Id*. at p. 657.)

Defendant argues that the testimony of Broome's wife and mother violated the rule Justice Moreno would have adopted. When asked whether she still had "a lot of pain," Annette Broome stated, "Yes. . . . I mean, when I think about how Mike was crying for help, you know, and nobody was there to help him. You know, what he must have thought, my God, I'm dying. . . . It was so cruel and so cold, and I think about that, and how I couldn't be there." Mary Broome testified she has trouble sleeping because she thinks "about how he laid there dying for no reason at all." When asked whether violence on television affects her, she stated, "I don't watch television anymore . . . . As soon as I see a gun, I shut it off right away . . . . I think of my son lying there in a pool of blood." As did the defendant in *Robinson*, defendant forfeited this issue by failing to object to this testimony on this ground. (*People v. Robinson*, *supra*, 37 Cal.4th at p. 652.)

Moreover, these brief references were not as explicit or detailed as the imagined reenactments of the crime in *Robinson* and were unlikely to have improperly influenced the experienced trial judge in the present case. These references more closely resemble testimony we upheld in *People v. Martinez* (2010) 47 Cal.4th 911, 960, where the victim's sister said that "what hurt her most was thinking of 'all that she went through'

31

and how [the victim] 'suffered that night' before her death," and the victim's brother said "he thought about her every day, 'especially for the brutal way she died.' " As we explained, "We have previously held evidence of this kind admissible at the penalty phase of a capital case. In *People v. Pollock* (2004) 32 Cal.4th 1153, the victims, an elderly married couple, died of multiple stab wounds inflicted by a butcher knife. We examined victim impact testimony from the deceased victims' loved ones describing how their 'grief was exacerbated by knowledge of the "savage" manner in which' the victims were killed 'and the pain they must have experienced during their final minutes.' [Citation.] A friend of the deceased described her shock at the couple's death and 'the brutal manner in which they died,' and the couple's surviving son testified about how 'the circumstances of his parents' deaths made it impossible for him to remember his parents, or his own childhood, without in some manner imagining the suffering of their final minutes.' [Citation.] We found no Eighth Amendment violation and concluded the testimony 'was proper and admissible victim impact evidence' because their testimony was 'limited to how the crimes had directly affected them' and they 'did not testify merely to their personal opinions about the murders.' [Citation.] The testimony in the present case is no different." (*Id*. at p. 961.)

Because defendant failed to object and, in any event, the facts here differ from those in *People v. Robinson*, *supra*, 37 Cal.4th 592, we, like the majority in *Robinson* itself, need not, and do not, decide whether to adopt the rule that Justice Moreno urged in that case. (See *People v. Robinson*, *supra*, at p. 652.)

Defendant cites *People v. Harris* (2005) 37 Cal.4th 310, in which we held that if a proper objection had been made the trial court "probably should have excluded" evidence that the victim's casket accidently opened during the victim's funeral service, because the evidence "was too remote from any act by defendant to be relevant to his moral culpability." (*Id*. at p. 352.) Defendant claims the same is true of various items of the victim-impact testimony of this case. Defendant forfeited this issue by failing to object to

32

this testimony on the ground he now raises on appeal. (*People v. Brady*, *supra*, 50 Cal.4th at p. 576.) In addition, each claim lacks merit.

Annette Broome testified that one reason her family moved to Vista was that New Jersey "was getting dangerous" and "San Diego was a safer area." When asked whether one reason the victim moved to Vista was because he was "concerned about the crime back east," the victim's brother replied, "I guess in a sense it had something to do with it. It was partly you think that there's more crime back in New Jersey, it's that close to New York. Mostly just the climate was the main reason, climate, and his love for the Rams [football team] that made him move out here." Had defendant objected, the trial court properly could have admitted this brief testimony. It was not emotional or inflammatory and helped to explain why the victim and his family moved to Vista. The trial court could also properly have admitted evidence that the victim had instructed his employees to cooperate in the event of a robbery at the jewelry store. This evidence was relevant to establish the circumstances of the offense by supporting the conclusion that the victim was shot without provocation. The trial court could also properly have permitted the victim's mother to testify that she had telephoned the victim a week before he died to ask whether he was going to be "okay with the riots in L.A." This was the last time she had spoken to her son, and the passing reference to the riots was so brief and unemotional that it could not have emotionally affected the outcome of the penalty phase trial.

Annette also mentioned that Michael had been proud that he had been a Chamber of Commerce president. Joseph Broome stated that several hundred people attended a memorial service for the victim. "[I]t is proper to refer 'to the status of the victim and the effect of his loss on friends, loved ones, and the community as a whole.' " (*People v. Marks* (2003) 31 Cal.4th 197, 236.)

Annette also testified that she operated the jewelry store for a few months following her husband's murder but found she was too afraid to display the jewelry at first. She frequently became alarmed and closed the store if anyone looked suspicious.

She also was fearful in other situations. The prosecutor asked about a bomb scare that had occurred during the guilt phase of the trial, and she responded: "Oh, yes. . . . I felt like saying, why are you all sitting here? What's wrong with you? Life is too fragile; you can't take a chance. And my kids only have one person to take care of them now and I can't take a chance." She went on to describe how her son was fearful and did not want to let her leave the house at night. The point of this testimony was not to show that the bomb scare had occurred, but to show the emotional reaction of the witness to common events since her husband's murder. "Victim impact evidence of this kind, directed toward showing the impact of the defendant's acts on the family of his victims, is admissible at the penalty phase of capital trials." (*People v. Taylor*, *supra*, 26 Cal.4th at p. 1171.)

Defendant also argues that victim-impact evidence should be permitted "only when it relates to characteristics of the victim that the defendant knew or reasonably should have known prior to committing the offense." We have held to the contrary. (*People v. Thomas* (2011) 51 Cal.4th 449, 508.) Moreover, the witnesses did not testify to any harm qualitatively different than what can reasonably be expected to occur when one enters a jewelry store with a gun, seizes a customer around the neck, places the gun to her head, sometimes points the gun at three other persons in the store, shoots an unresisting, cooperative man through the chest at point-blank range, and then continues with the robbery as if nothing had happened, thus preventing the three surviving victims from aiding the moaning and dying victim. Defendant may not have known the exact details of the harm he was causing, but that the harm would be of the type the witnesses described was quite foreseeable. Defendant knew, or certainly should have known, he was causing this kind of harm.

Finally, defendant argues that "[t]his court should acknowledge that *Payne v. Tennessee*[, *supra*, 501 U.S. 808,] was wrongly decided and hold that victim impact evidence is barred by the United States and California Constitutions." We have no

34

authority to overturn United States Supreme Court decisions, and defendant proffers no persuasive reason for us to overrule our own decisions regarding victim-impact evidence.

In sum, the victim-impact evidence of this case was unremarkable given the nature of defendant's crime. It was entirely admissible.

### E. Testimony that Defendant Displayed Hatred

Mary Deighton testified over defendant's objection that defendant "was more hostile" toward the murder victim than the other robbery victims. She stated, "He left the rest of us pretty much alone, but he was really angry — his whole attitude towards Mike was just really kind of cocky and angry towards him. It was just so much hatred." In summarizing the penalty phase evidence, the trial court noted Deighton's testimony that defendant showed hatred and anger toward the murder victim.

Defendant argues that the testimony that defendant displayed hatred was an improper opinion based on speculation. We disagree. Deighton was a percipient witness to the crime; as such, she was competent to testify that defendant displayed hatred before shooting the victim. In *People v. Chatman* (2006) 38 Cal.4th 344, a witness testified that he had seen the defendant repeatedly kick a high school custodian and answered affirmatively when asked if the "defendant 'seemed to be enjoying it.' " We held that the trial court acted within its discretion in admitting this evidence. "Because the witness was a percipient witness, he spoke from personal observation. He was competent to testify that defendant's behavior and demeanor were consistent with enjoyment." (*Id*. at p. 397.) We further concluded the testimony was not improper opinion evidence, noting that although in general, "a lay witness may not give an opinion about another's state of mind[,] . . . a witness may testify about objective behavior and describe behavior as being consistent with a state of mind." (*Ibid*.) The same applies here. Deighton merely testified about what she observed.

Defendant relies on *United States ex rel. Williams v. Twomey* (7th Cir. 1975) 510 F.2d 634, 641, where the court said that "a cautious judge may also recall that the first Queen Elizabeth declared that we have no window into other men's souls." But the court also said "[t]here are times when the observer from facial expressions of the witness or his demeanor in testifying may rightly infer motive or other mental state." (*Id*. at pp. 640-641.) We see no error.

**F. Considering Mitigating Evidence as Aggravating Evidence**

Defendant claims the trial court erroneously considered mitigating evidence as aggravating in several respects. It did not do so. Instead, it merely considered some of the evidence offered in mitigation to be not particularly mitigating, especially when considered in light of the crime. Doing so was appropriate.

In *People v. Young* (2005) 34 Cal.4th 1149, 1219, the defendant contended that the prosecutor had improperly transformed mitigating evidence into aggravating evidence by arguing to the jury that "evidence that defendant had rejected the training, teaching, and moral upbringing provided by his family did not extenuate the gravity of his offenses . . . ." We disagreed. "The prosecutor did not argue that the jury should consider mitigating defense evidence in aggravation. ' "A prosecutor does not mischaracterize such evidence [offered in mitigation] by arguing it should not carry any extenuating weight when evaluated in a broader factual context. We have consistently declined to criticize advocacy of this nature." ' [Citations.]" (*Id*. at pp. 1219-1220.) The court's comments that defendant challenges were similarly proper.

In announcing its penalty verdict, the court provided a detailed statement of the factors in mitigation and aggravation it considered. It discussed each of the sentencing factors in turn. The court first discussed the mitigating factors. It prefaced its summary of the section 190.3, "factor (k) evidence" by correctly stating that "[f]actor (k) evidence is any other evidence which extenuates the gravity of the crime." It summarized the

36

testimony of each of defendant's witnesses and stated that "the court went through the entire testimony of each witness, made notes, and summarized it so that the court would not leave out one positive mitigating factor that was referenced by those witnesses . . . ." It noted as a mitigating factor that defendant "came from a loving, supportive, very close family environment." Referring to Summersville's involvement, the court stated that defendant had received "mitigating consideration for the joint nature of the criminal planning, the casing of the area. There is clear evidence that Byron Summersville was with the defendant driving around the area beforehand, and that the defendant was the passenger in that car."

After stating that it had considered "all the [section 190.3,] factor (k) evidence" in mitigation, the court turned to the aggravating factors and recounted "the facts of the crime," describing the crime as "a murder in the course of a robbery and a burglary of a jewelry store where over $14,000 of jewelry was stolen by the defendant" and concluding that defendant displayed "a callous indifference to the robbery victims looking down the barrel of a .44 magnum pistol." The court observed that "[d]efendant was given the benefit of a loving, caring, religious family, but turned his back on that wonderful supportive background, and joined with a man he knew as a drug dealer, Byron Summersville."

The court continued: "Of grave significance is the violation of the most bas[ic] of fair play notions that you shoot an unarmed, defenseless human, who is in the process of cooperating with your robbery demands and has his hands raised in complete submission . . . . The victim did nothing to provoke and instigate the shooting. Instead the defendant pulled back the hammer of the gun, and with a second of hesitation . . . then chose to pull the trigger." The court concluded that this "purposeful execution" was confirmed by the fact that defendant then continued with his robbery "[w]hile the victim lay begging for help . . . as if nothing [had] happened."

37

The court's brief reference to defendant turning his back on his "wonderful supportive background" did not treat defendant's background as an aggravating factor. Rather, the court properly concluded that the evidence of defendant's family background did not mitigate this particular crime.

Similarly, defendant claims the trial court erroneously gave aggravating weight to the evidence he offered of his intellectual and psychological deficits. The court found "[t]here is no evidence of extreme mental or emotional disturbance at the time of the commission of this offense. This . . . does not mean the court cannot lend some consideration to mental conditions on a lesser level under factor (k). So under factor (k) the court does consider the lesser issue of the defendant having a lower I.Q. and a dull mental state as far as intelligence. The court also considers other pressures which were mentioned by Doctor Maclaren of financial pressures and job pressures that he may have been feeling at that time." In summarizing the mitigating evidence considered under section 190.3, factor (k), the court stated, "defendant was slow in school. He had a school history plagued by voluntary truancy." The court further noted that defendant "has been described [as] low, average intelligence, or dull intelligence. The defendant had a checkered job history. However, it was plagued by his own voluntary absences from these jobs which, as the defendant told one of the doctors, that he missed work when he wanted to."

Defendant argues that the trial court erroneously considered mitigating evidence as aggravating evidence because it dismissed statements defendant reportedly made to the mental health professionals who examined him claiming that the "gun went off" accidently. The trial court properly rejected defendant's assertion that the gun fired accidently as part of the trial court's consideration of the circumstances of the offense as aggravating evidence. (*People v. Smith* (2005) 35 Cal.4th 334, 354.)

Defendant also asserts the court considered in aggravation the testimony that defendant has a "limited capacity for abstract thinking" which causes him to be "more

38

likely to seek immediate gratification [than] postpone small gratifications for larger ones at a later date." The trial court rejected defendant's claim that he entered the jewelry store expecting Summersville to follow him, concluding instead that defendant acted alone. It stated, "One personal trait that has come clear through the evidence is that the defendant is a person of immediate gratification. He does not wait if something can be achieved sooner. The defendant acted alone, used the cloth bag, took the loaded pistol, gave loud, clear orders to the store employees, took an innocent hostage, and shot and killed an innocent, cooperative person." The court simply observed that defendant's evidence that he had a personality trait of seeking immediate gratification was consistent with the court's findings regarding the circumstances of the crime that defendant acted alone, rather than supporting defendant's assertion that he was less culpable because he acted under the influence of Summersville.

Defendant contends that the court's statements that defendant's job history "was plagued by his own voluntary absences from these jobs," and that defendant "had a school history plagued by voluntary truancy" also show the court considered defendant's evidence in mitigation as aggravating evidence. Again we disagree. These statements were made as part of the court's discussion of the evidence defendant introduced under factor (k) of section 190.3 and simply demonstrate that the court gave this evidence little mitigating weight.

For similar reasons, we reject defendant's claim that the trial court wrongly gave aggravating weight to mitigating evidence that defendant introduced to show that Summersville planned the robbery and manipulated defendant to carry it out. Factor (g) of section 190.3 directs the trier of fact to take into account "[w]hether or not defendant acted under extreme duress or under the substantial domination of another person." The court found "there is no evidence of extreme duress," but there was "evidence of some planning in the crime involving Byron Summersville." It found no "substantial domination," stating, "Substantial domination needs to be such as to lessen the

39

defendant's own free will.  It has to be such as to cause one not to act independently."
The trial court found that the circumstances of the crime demonstrated that defendant
acted on his own and of his own free will.  Defendant argues the court erroneously gave
aggravating weight to this evidence because it observed that defendant attempted to
"minimize" his role in the crime and "over-emphasized the influence and impact of
Byron Summersville."  Again, the court properly discounted the mitigating evidence
defendant introduced and properly relied on the circumstances of the crime as
aggravating evidence.

### G. Cumulative Error Affecting the Penalty

Defendant claims the cumulative effect of the asserted errors was prejudicial as to
penalty.  But, as with defendant's comparable contention regarding guilt, there was no
error to accumulate.

### H. Automatic Application to Modify the Verdict

Defendant contends the trial court did not conduct a proper hearing on his
automatic application to modify the death verdict under section 190.4, subdivision (e).

As relevant, section 190.4, subdivision (e), provides:  "In every case in which the
trier of fact has returned a verdict or finding imposing the death penalty, the defendant
shall be deemed to have made an application for modification of such verdict or
finding . . . .  In ruling on the application, the judge shall review the evidence, consider,
take into account, and be guided by the aggravating and mitigating circumstances
referred to in Section 190.3, and shall make a determination as to whether the jury's
findings and verdicts that the aggravating circumstances outweigh the mitigating
circumstances are contrary to law or the evidence presented.  The judge shall state on the
record the reasons for his findings."

Before accepting defendant's waiver of a jury trial, the trial court advised him that
it would *not* "conduct a separate, independent review of the evidence" under section

190.4 "because the judge has made the decision." The court explained that "the automatic, independent review of the evidence and the way the law was applied by the court will not take place in a jury waiver because there is no jury performance for [the trial judge] to review." Defendant stated he understood, and both defense counsel stated they agreed.

At the end of the penalty phase, before it rendered its verdict, the trial court stated that because it could not conduct an independent review of the evidence under section 190.4, subdivision (e), it would "make a detailed statement of the factors in mitigation and the factors in aggravation that the court considered" in reaching its verdict. It explained its verdict in great detail. Then, about two months later, "in an abundance of caution," the court did conduct a hearing under section 190.4, subdivision (e). Once more it reviewed in detail the mitigating and aggravating evidence. After that review, it found "that the judgment that was rendered in this case was rendered pursuant to the evidence, the weight was supported by it, and that it was a legal judgment." Accordingly, it denied the automatic motion to modify the verdict.

Defendant's contention that he did not receive a proper hearing under section 190.4, subdivision (e), is not cognizable on appeal because he did not object at trial. (*People v. Horning* (2004) 34 Cal.4th 871, 912.) Indeed, defendant not only failed to object, he expressly acknowledged before trial that he would not receive such a hearing due to his jury waiver. Moreover, the claim lacks merit.

" 'We have never decided whether a defendant who waives a jury trial on the issue of penalty is entitled to a modification hearing under section 190.4, subdivision (e).' " (*People v. Horning*, *supra*, 34 Cal.4th at p. 912, quoting *People v. Diaz*, *supra*, 3 Cal.4th at p. 575.) We noted in *Horning* that such a hearing after a penalty phase court trial would not be entirely futile because the requirement that the trial court state on the record the reasons for its findings " 'enables us to review the propriety of the penalty determination made by the trial court sitting without a jury.' " (*People v. Horning*, *supra*,

at p. 912, quoting *People v. Diaz*, *supra*, at p. 575, fn. 35.)  In *Horning*, the trial court had given a detailed statement of reasons for its penalty phase verdict, and we observed that "[n]othing in section 190.4 suggests the court must state its reasons *twice*."  (*People v. Horning*, *supra*, at p. 912.)  In this case, the trial court did state its reasons twice — once when it imposed the death penalty and a second time when it denied the automatic motion to modify the verdict.  No error occurred.

Defendant argues that because section 190.4, subdivision (e), does not logically apply to a court trial, the California death penalty scheme is "unconstitutional in that it fails to provide a mechanism for an independent review of a trial court's penalty phase verdict."  He contends that the statute should require "another judge to review the sentencing judge's verdict."  He cites no authority holding that a defendant who waives a jury has a constitutional right to an independent review of the court's verdict, and we decline to so hold.  Defendant fully understood that he would not receive an independent review of the court's verdict when he waived his right to a jury trial.  It was his decision to waive a jury and thus not receive that independent review.  Permitting him to make that decision did not violate his rights.

## I. Challenges to California's Death Penalty Law

Defendant challenges California's death penalty laws in numerous ways, most of which we have previously considered and rejected.  He provides no persuasive reason for us to reconsider our holdings.  Accordingly, we reaffirm the following holdings.

The California death penalty scheme does not fail to adequately narrow the class of offenders eligible for the death penalty.  (*People v. Beames* (2007) 40 Cal.4th 907, 933-934.)  Section 190.3, factor (a), has not been "applied in 'a wanton and freakish manner' resulting in arbitrary and capricious imposition of the death penalty."  (*People v. Russell* (2010) 50 Cal.4th 1228, 1274.)  "Prosecutorial discretion in deciding whether to

42

seek the death penalty does not result in a violation of equal protection, due process, or reliability in capital sentencing." (*People v. Gonzales* (2011) 51 Cal.4th 894, 958.)

The prosecution is not required to "prove beyond a reasonable doubt the existence of aggravating circumstances, or that the aggravating circumstances outweigh the mitigating circumstances, or that death is the appropriate punishment. [Citations.] The high court's recent decisions interpreting the Sixth Amendment's jury trial guarantee [citations] do not alter these conclusions." (*People v. Lee* (2011) 51 Cal.4th 620, 651-652.) The information need not "allege all the facts necessary to justify the death penalty . . . ." (*People v. Bramit* (2009) 46 Cal.4th 1221, 1238.) The death penalty statutes need not designate a burden of proof. (*People v. Murtishaw* (2011) 51 Cal.4th 574, 596.)

"Comparative intercase proportionality review of death sentences is not constitutionally required." (*People v. Moore* (2011) 51 Cal.4th 386, 417.)

Because of section 190.3, subdivision (k)'s catchall provision, the use of restrictive terms such as "extreme," "reasonably," "substantial," "at the time of the offense," and "impaired" in that section does not prevent the trier of fact from considering all relevant mitigating evidence. (*People v. Thomas*, *supra*, 51 Cal.4th at p. 506; *People v. Cowan* (2010) 50 Cal.4th 401, 509; *People v. Taylor*, *supra*, 26 Cal.4th at p. 1179.) Section 190.3, factor (k) is not unconstitutionally vague. (*People v. Mendoza* (2000) 24 Cal.4th 130, 192.)

The court stated it would consider the then-standard jury instructions in rendering its penalty verdict. Accordingly, defendant reiterates challenges to those instructions we have repeatedly rejected. Those instructions need not state that statutory mitigating factors are relevant only in mitigation or that the absence of a mitigating factor is not aggravating. (*People v. Thomas*, *supra*, 51 Cal.4th at pp. 506-507.) (Moreover, the court's statement of reasons for its verdict made clear it did not consider in aggravation any of the mitigating factors or the absence of a mitigating factor. (See pt. II., F., *ante*.))

43

CALJIC Nos. 8.85 and 8.88 are not unconstitutional in other respects. (*People v. Bramit*, *supra*, 46 Cal.4th at pp. 1248-1250.)

California's death penalty law does not violate equal protection principles even though the sentencing procedures for capital defendants differ from those for noncapital defendants. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1430.) Imposition of the death penalty for felony murder is not unconstitutional. (*People v. Harris*, *supra*, 37 Cal.4th at p. 365.) "The death penalty, when applied in accord with state and federal statutory and constitutional requirements, does not violate international law. [Citation.] International norms of human decency do not render the death penalty, applied as a regular form of punishment, violative of the Eighth Amendment. [Citations.]" (*People v. Cowan*, *supra*, 50 Cal.4th at p. 510.)

Defendant raises a new argument that California's death penalty is unconstitutional because a voter initiative, rather than the Legislature, enacted the special circumstances. Although the Legislature enacted the 1977 death penalty law, an initiative adopted by the voters in 1978 supplanted that law. (*People v. Rodriguez* (1986) 42 Cal.3d 730, 777.) Defendant asserts that "[t]he Supreme Court specifically directed that legislatures devise the narrowing circumstances." In *Gregg v. Georgia* (1976) 428 U.S. 153, 195, a high court plurality stated that "the concerns expressed in *Furman* [*v. Georgia* (1972) 408 U.S. 238] that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." Nothing in *Gregg* or *Furman* suggests that the *Legislature*, rather than the voters, must enact such a statute. The high court in *Zant v. Stephens* (1983) 462 U.S. 862, 878, did use the phrase "legislative definition" in holding "that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." But a definition in a statute enacted using the initiative process is a legislative definition just as much as is one

44

in a statute the Legislature enacted. "[T]he power to legislate is shared by the Legislature and the electorate through the initiative process." (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1038.) "The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them." (Cal. Const., art. II, § 8, subd. (a).) The current death penalty law is not unconstitutional because it was enacted by initiative.

Finally, because there are no constitutional or international law infirmities in the death penalty law, the cumulative effect of the asserted infirmities does not render the death penalty law invalid.

### III. CONCLUSION

We affirm the judgment.[3]

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
EPSTEIN, J.*

---

[3] Shortly before oral argument, we received a one-page letter from the Attorney General summarily citing two cases not contained in the briefs. Defendant filed a motion to strike the letter. We deny the motion. Because the two cases cited in the letter played no role in our decision in this case, we did not request a response from defendant.

* Presiding Justice of the Court of Appeal, Second Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Weaver

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S033149
**Date Filed:** April 16, 2012

_____

**Court:** Superior
**County:** San Diego
**Judge:** J. Morgan Lester

_____

**Counsel:**

James S. Thomson and Elisabeth Semel, under appointments by the Supreme Court; Saor E. Stetler, Ty Apler and Charles D. Weisselberg for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Angela M. Borzachillo, Deputy Attorney General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Elisabeth Semel
U.C. Berkeley School of Law
794 Simon Hall
Berkeley, CA  94720-7200
(510) 642-0458

Angela M. Borzachillo
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 525-4393