Filed 3/16/16  P. v. Hernandez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B255400 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA123386) |
| v. | |
| ISRAEL HERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur M. Lew, Judge.  Reversed in part, remanded, and otherwise affirmed as modified.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

A jury found defendant and appellant Israel Hernandez guilty of two counts of carjacking and found true gun and gang allegations. He raises numerous contentions on appeal, including that the jury was improperly instructed it could not consider evidence of his voluntary intoxication on his ability to form a specific intent to commit the carjackings to benefit his gang. Because we agree with this contention and conclude that the instructional error was prejudicial, we reverse the true finding on the gang allegation and remand for further proceedings. Except for a restitution order, which we strike, we reject Hernandez's remaining contentions and otherwise affirm the judgment as modified.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     Factual background.**

A.     *The carjackings.*

On May 29, 2012, Billy Greene was driving his FedEx delivery truck near Long Beach Boulevard. Defendant Hernandez, wearing a black jacket with a hood and carrying a black gun, got into the truck's passenger side. Hernandez said something, but Greene couldn't make out what it was. Although Hernandez has a tattoo on his face, Greene did not see it. Greene got out of his truck, which sped away, and he got into a passerby's car to follow the FedEx truck.

Erik Anguiano was driving his Mustang when the FedEx truck tried to make a U-turn in front of him. The front part of the FedEx truck hit Anguiano's car, damaging it. A Tahoe driven by Selestino Diaz then ran into the FedEx truck. Hernandez, who was wearing a cap with a "P" on it, got out of the FedEx truck. Saying " '[g]et out of here, puto,' " Hernandez pushed Diaz and drove away in Diaz's Tahoe. Hernandez made a motion that made Diaz think Hernandez had a weapon. At the intersection of Abbott and Otis, the Tahoe hit a tree. Hernandez fled on foot.

Maria Beltran lived on Otis. She heard a crash and saw a "guy" "coming from the white truck." The guy ran to the property next door to Beltran's home. When deputy sheriffs arrived at Otis, they saw a male Hispanic, who was sweating profusely and had

2

something in his waistband, jump over a small wall. The deputies found a black gun in that area, where Beltran lived. Mercedes Estrada was also at her nearby home when she saw someone "going through the side of" her house. The police arrested defendant, who was wearing only Estrada's nephew's sweat pants.

A black Pittsburgh Pirates hat with a "P" on it was recovered from the scene. Surveillance footage of the carjacking showed Hernandez tossing a bag to the ground. The bag contained, among other things, numerous gift cards and Sarah Carretero's California Benefits Identification card.

Greene, Diaz, and Anguiano identified Hernandez at a field show up.

Hernandez was transported to the hospital. Deputy Thomas Spinks stayed with Hernandez, who was "extremely agitated and thrashing around on the gurney to the extent where he was kind of violent" and had to be restrained. "He was convulting (sic) his body, kind of – he was talking to the people through the hallway. He would blurt out a local street gang," Lynwood Varrio Paragons, at least five times. When Deputy Spinks asked what Hernandez was called, Hernandez replied, "Fat Boy." The deputy believed that Hernandez was under the influence of methamphetamine. Still, despite Hernandez's agitation, he spoke respectfully, clearly, and concisely to the deputy.

Hernandez tested "presumptive positive for amphetamines, methamphetamines, and canabinoids." An alcohol test indicated 210 milligrams per deciliter of alcohol in his system.

B.     *Gang evidence.*

Detective Grant Roth investigated African American gangs in the City of Lynwood, although he also investigated Hispanic gangs. One such Hispanic gang was the Lynwood Varrio Paragons, whose turf is El Segundo to the south, Santa Fe to the west, the 105 Freeway to the north, and Long Beach Boulevard to the east. The gang has 80 to 90 members, and its rivals include Rude Boys, in whose territory the carjacking occurred. Hernandez is a member of the Paragons, and his moniker is Stopper, but he

3

gives Fat Boy to police. He has tattoos associated with the Paragons, including a "hand signal . . . making out the letter P" on his face and "Lynwood" on his scalp.

Gangs in general thrive by creating an atmosphere of fear and intimidation in a community. The "crimes that [the Paragons] have been known to commit and have been documented" "range from vandalism and graffiti to narcotics possession and sales, assaults, assault and batteries, shootings, stabbings, robberies, [extortion], carjackings, attempted murders, murders."

Based on a hypothetical modeled on the facts of the case, Detective Roth opined that carjacking a FedEx truck and a Tahoe benefitted the Lynwood Varrio Paragons. "[P]articular to the gang Lynwood Varrio Paragons, carjacking a FedEx truck, a shipment truck, a package truck, something like that, carjacking it and stealing it provides an opportunity for the gang and its members to essentially sell the potential merchandise that's within it. [¶] The actual carjacking itself helps establish that atmosphere of fear and intimidation within the community that this gang is bold; it will commit an act of violence such as a carjacking in an area not controlled by that gang in broad daylight. [¶] And it also boosts the individual's status within the gang, because gang members are expected to, one, either put in work, which is committing violent types of crime within the community; or, two, make a profit for the gang. In this type of crime, that individual accomplishes both of those expectations. [¶] He shows his willingness to commit a violent crime, carjacking, [in] broad daylight. He has very distinct tattoos on his person which identify him as a gang member. And the people that live in the City of Lynwood or someone who lives in the City of Lynwood could make the assumption that that P hand sign tattooed on his face would be associated with that gang, the Paragons gang."

C.    *The defense case.*

Dr. Mitchell Eisen, an expert, testified about the process of eyewitness identification.

4

**II.    Procedural background.**

On May 16, 2013, a jury found Hernandez guilty of count 1, carjacking Greene (Pen. Code, § 215, subd. (a))**[1]** and of count 2, carjacking Diaz.  The jury found true gang allegations (§ 186.22, subd. (b)(1)(C)) as to both counts and a gun allegation (§ 12022.53, subd. (b)) as to count 1.

On February 21, 2014, the trial court sentenced defendant, on count 1, to five years plus a consecutive 10 years for the gang enhancement plus 10 years for the gun enhancement.  On count 2, the court sentenced him to a concurrent term of 15 years.  At a restitution hearing on April 4, 2014, the parties stipulated to restitution in the amount of $3,000 to Anguiano.

**DISCUSSION**

**I.    The trial court's comments on reasonable doubt did not violate Hernandez's due process rights.**

Hernandez contends that comments the trial court made during voir dire about reasonable doubt violated his Sixth and Fourteenth Amendment rights.  We disagree.

A.    *Additional background.*

After a panel of prospective jurors was called, the trial court instructed them on, among other things, reasonable doubt:  "The prosecution in a criminal case has the burden of proof beyond a reasonable doubt.  I will define that burden now and in my closing instructions.  [¶]  A reasonable doubt is defined as follows:  It is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which, after the entire comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

---

**1**    All undesignated statutory references are to the Penal Code.

5

Voir dire proceeded.  During defense counsel's voir dire, this exchange occurred:

"[Defense counsel]:  99 men go in, and they just take over a village.  They start fires, they – everything.  And all 99 men have the same clothes on, are about the same stature, everything, but what we do know is there was 99 of them.  [¶]  The police follow these 99 men back to the village, and when they – to their village, and when they get to their village, they do a head count, and there is 100 people, all dressed the same, all fit the description of the 99 suspects, and that's all the information that you have.  [¶] Prospective juror number 14, what happens to those hundred men that are arrested?  [¶]

"Prospective juror number 14:  They get tried.

"[Defense counsel]:  Okay.  And how would you – based on that evidence, how would you vote?

"Prospective juror number 14:  I'm not sure.

"[Defense counsel]:  Prospective juror number 13?

"Prospective juror number 13:  I would have to see all of the evidence.  I couldn't say that they were guilty just because they were with the police.

"[Defense counsel]:  Right.  And the theory behind this hypothetical is you know that there were 99 suspects, but you arrested 100 people.  So any one of those individual people, there is reasonable doubt as to his guilt.  So in a case like that, a jury would be expected to find all 100 people not guilty.  [¶]  Does that make sense to everybody? Would anybody have a problem doing that?  Do you think it's safer just to convict all 100 of them and then we know we got 99 percent of them, or would you – [¶]

"The court:  I don't think you should use hypos like that to instruct the jury as to what's reasonable doubt and what's not reasonable doubt.

"[Defense counsel]:  I apologize, your honor. That's not what I was doing.  I think the court has –

"The court:  Well, that's what you did, though.

"[Defense counsel]:  It's a hypothetical.

6

"The court: I know that. And you were illustrating what you believe to be a reasonable doubt to the jury, and you shouldn't be doing that.

"[Defense counsel]: If there is one person amongst 100 people that you know did not commit those 99 crimes, that would be reasonable doubt. [¶] Would anybody have a problem when there is reasonable doubt, even if you know you're going to get – 99 percent of the other guys are going to be let go? Does anybody think that the law should be different, and, hey, maybe it's better to convict all 100 of them?

"The court: All right. Let me just clear something up, ladies and gentlemen. The law doesn't say that if 99 people committed a crime and you go into the camp and there is 100 of them, the law doesn't say that it's necessarily reasonable doubt. That's what I was trying to get across to counsel. And I guess we're not communicating. [¶] In that factual scenario, the law doesn't say that that's reasonable doubt. So I wouldn't be doing that if I were you.

"[Defense counsel]: The court is going to instruct you on what reasonable doubt is. Okay? And you have a duty to follow the court's instruction as to what reasonable doubt is. [¶] Based on the facts, it is – that I have given to you, and that's just a matter of there were 99 suspects, 100 people dressed exactly alike, fitting the exact same description are all arrested. Would that raise a reasonable doubt in your mind as to each of those suspects? [¶] Prospective juror number 13?

"Prospective juror number 13: Well, yes, because there is 100 of them, and we don't know who was actually the one guilty.

"[Defense counsel]: Fair enough. [¶] Does anybody disagree with prospective juror number 13? Okay.

"Prospective juror number 13: I'd have a hard time letting the 99 people go.

"[Defense counsel]: Fair enough. Fair enough. [¶] Under that hypothetical, would you rather convict all 100 of them?

"Prospective juror number 13: That's a tough hypothetical, but I guess that – I guess I would just have a tough time letting the 99 go.

7

"[Defense counsel]: And I'm surprised to hear that from you, and let me tell you –

"The court: Your time is passed up."

Thereafter, when a new panel of prospective jurors was called to the courtroom, the trial court instructed them on reasonable doubt, under CALJIC No. 2.90. The impaneled jury was instructed on reasonable doubt before it retired for deliberations.

B. *The jury was properly instructed on reasonable doubt.*

Due process requires the government to prove beyond a reasonable doubt every element of a charged offense. (*Victor v. Nebraska* (1994) 511 U.S. 1, 5.) Although the Constitution does not require any particular form of words be used in advising a jury of that burden of proof (*ibid.*), it is improper to suggest "a quantitative measure of reasonable doubt" (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1268). In *Katzenberger,* the prosecutor showed to the jury six of eight puzzle pieces immediately and easily recognizable as the Statue of Liberty. (*Id.* at p. 1264.) The prosecutor argued that the jury could know beyond a reasonable doubt that the puzzle was a picture of the Statue of Liberty, even though two pieces were missing. (*Id.* at pp. 1264-1265.) This presentation improperly suggested "a specific quantitative measure of reasonable doubt, i.e., 75 percent." (*Id.* at p. 1268.)

To the extent an improper quantitative measure was assigned to reasonable doubt here, it was defense counsel, not the trial court, who made it. After counsel gave the hypothetical, the court immediately admonished counsel not to "use hypos like that to instruct the jury as to what's reasonable doubt and what's not reasonable doubt." When counsel continued with her hypothetical, the court again interjected that "[t]he law doesn't say that if 99 people committed a crime and you go into the camp and there is 100 of them, the law doesn't say that it's necessarily reasonable doubt. . . . [¶] In that factual scenario, the law doesn't say that that's reasonable doubt." These comments could not, as Hernandez suggests, be reasonably understood to instruct the jury that society tolerates the conviction of one innocent person as long as 99 guilty people are convicted or otherwise to "water down" the presumption of innocence. Read in context,

8

the court corrected counsel's misstatement that reasonable doubt can be quantified. The court was clearly saying that using "hypos" and "illustrations" to explain reasonable doubt was improper.

But even if ambiguity or error could be attributed to the trial court's comments, it is beyond a reasonable doubt that any error did not contribute to the verdict, under the standard in *Chapman v. California* (1967) 386 U.S. 18, 24. (See *People v. Katzenberger, supra,* 178 Cal.App.4th at pp. 1268-1269 [applying *Chapman* to prosecutor's misconduct in misstating reasonable doubt standard].) "[E]rrors or misconduct occurring during jury voir dire, prior to the introduction of evidence or the giving of formal instructions, are far less likely to have prejudiced the defendant." (*People v. Medina* (1995) 11 Cal.4th 694, 744-745 [any confusion created by prosecutor's voir dire chart showing reasonable doubt to be a line somewhere below a line labeled " '100 percent certainty' " was dispelled by CALJIC No. 2.90].) The court here properly instructed prospective jurors, twice, on reasonable doubt under CALJIC No. 2.90 and instructed the jury after the close of evidence under CALCRIM No. 220. (See *People v. Aranda* (2012) 55 Cal.4th 342, 353 [a court satisfies its statutory obligation to instruct on reasonable doubt by giving CALJIC No. 2.90 or CALCRIM No. 220].)

## II.    The prosecutor did not commit misconduct.

Hernandez next contends that the prosecutor committed misconduct by shifting the burden of proof to the defense. No prosecutorial misconduct occurred.

During his closing rebuttal argument, the prosecutor said, "Let me also talk a little bit about when [defense counsel] decides to put on a defense, which they did through Mr. Eisen. You're then allowed to critically analyze their case, and you are allowed to look at the failure of them to call logical witnesses." Defense counsel objected that the prosecutor was "shifting the burden to the defense." The trial court overruled the objection but told counsel to "choose his words very carefully." The prosecutor said he would but "[i]t's a failure to call logical witnesses. [¶] [Defense counsel] and myself have something that's called the subpoena power of the court. . . . [¶] We could take a

9

piece of paper and give it to somebody, and the court says now you have to come to court, and if you don't, we could arrest you and bring you to court. It's a very powerful tool. That's what we use on a daily basis to get people to come to court. [¶] [Defense counsel] has that same exact power that I have. She used it to get Mr. Eisen into court." The court overruled defense counsel's objection but told the prosecutor to "stick to the evidence." The prosecutor then pointed out that no "other witness that lived on Mallison or on Otis was called. They have the same power we do." Defense counsel's objection that the prosecutor shifted the burden was again overruled.

It is improper for the prosecutor to misstate the law generally, and in particular, to attempt to lower or to shift the burden of proof. (*People v. Hill* (1998) 17 Cal.4th 800, 829; *People v. Williams* (2009) 170 Cal.App.4th 587, 635.) However, "[a] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.)

The distinction applies. The prosecutor was not suggesting that defendant had any burden of proof. Instead, the prosecutor was commenting on the state of the evidence; namely, that the defense did not call any witness other than Dr. Eisen to contradict prosecution witnesses who identified Hernandez as the carjacker. (See, e.g., *People v. Weaver* (2012) 53 Cal.4th 1056, 1077 [prosecutor's comment that he was waiting for an explanation how someone other than the defendant could have murdered the victim was a permissible comment on the state of the evidence].) This is clear from the context. When, for example, the prosecutor noted that the defense called no witness who lived near where Hernandez was arrested, this was in response to defense counsel's closing argument that Estrada, who saw a man in her backyard and said that defendant was wearing her nephew's sweat pants when arrested, was not credible. The prosecutor's comments therefore did not amount to misconduct.

10

**III. Trial counsel did not provide ineffective assistance by failing to object to the prosecutor's closing argument.**

Hernandez contends his trial counsel provided ineffective assistance because she failed to object to the prosecutor's "inflammatory" argument. We disagree.

During his closing rebuttal argument, the prosecutor said, "What else do we know, the FedEx trucks – this isn't just a carjacking of another car, folks. This isn't a carjacking of a random car. What do we know about FedEx trucks? What do they have in their back? They have people's property. Not only do they have like electronics perhaps or physical items that are valuable, they also have what – personal identifying information. Social security stuff, your address, your phone numbers." The trial court overruled defense counsel's objections the argument misstated the testimony and the evidence. The prosecutor continued, "They have mail in them. And what does mail have? Mail has your identifying information on it, right? What do we find in the defendant's pants that he threw in the bag?" Defense counsel again objected that the prosecutor was misstating the evidence, which objection was overruled. The prosecutor then pointed out that Hernandez had, among other things, "Cards. Who is this person? Sarah Carol. Why is that person's card in his pants, and all of these other gift cards? [¶] Folks, this is also evidence of other crimes that gang members would commit. [¶] . . . [¶] They're going to – they're going to steal personal identifying information and use it to benefit them."

To establish that his counsel was ineffective for failing to object to this argument, Hernandez "must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Scott* (1997) 15 Cal.4th 1188, 1211-1212; see also *Strickland v. Washington* (1984) 466 U.S. 668, 694.) Hernandez thus argues that his counsel should have objected to the prosecutor's argument because it was an improper appeal to the sympathy and passions

11

of the jury. (See generally *People v. Shazier* (2014) 60 Cal.4th 109, 146 [prosecutors "generally may not appeal to sympathy for the victims by exhorting the jurors to step into the victims' shoes and imagine their thoughts and feelings as crimes were committed against them"]; *People v. Fields* (1983) 35 Cal.3d 329, 361-363 [prosecutor's exhortation to jurors to view the crime through the murder victim's eyes was misconduct, albeit not prejudicial].)

This is not what the prosecutor here did. The prosecutor did not invite jurors to view themselves as victims of defendant's crimes. Rather, the prosecutor pointed out that FedEx trucks contain people's valuables and personal information, and Hernandez had such items, for example, gift cards and "Sarah Carol's" identification card. The prosecutor then tied this evidence to the gang expert's testimony that such a carjacking benefits the gang, because the gang uses those items and information. This was a fair comment on the evidence and the reasonable inferences or deductions that could be drawn from it. (See, e.g., *People v. Collins* (2010) 49 Cal.4th 175, 213.) Because the argument was not "inflammatory," defense counsel cannot be faulted for failing to object to it on that ground.

## IV. Instructional error on voluntary intoxication was prejudicial.

At defense counsel's request, the jury was instructed that voluntary intoxication could negate Hernandez's specific intent to commit the carjackings. Defense counsel, however, failed either to request a similar instruction that voluntary intoxication could negate Hernandez's specific intent to commit the crimes for the benefit of his gang or to object to the voluntary intoxication instruction as given. This, we conclude, led to prejudicial error.

The jury was instructed on voluntary intoxication under CALCRIM No. 3426: "*You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way*. You may consider that evidence only in deciding whether the defendant acted with the intent to deprive the other person of possession of the vehicle either temporarily or permanently. [¶] A person is voluntarily intoxicated if he or she becomes

12

intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] In connection with the charge of carjacking, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the intent to deprive the other person of possession of the vehicle either temporarily or permanently. If the People have not met this burden, you must find the defendant not guilty of carjacking. [¶] *You may not consider evidence of voluntary intoxication for any other purpose*." (Italics added; see also § 215, subd. (a).) CALCRIM No. 3426 was therefore limited to the substantive offense, carjacking. Specific intent, however, was also an element of the gang allegation on which the People had the burden of proof. (§ 186.22, subd. (b)(1); *People v. Albillar* (2010) 51 Cal.4th 47, 59, 64-65.) It was error not to extend the instruction to the gang allegation.

Whether viewed under the beyond a reasonable doubt test in *Chapman v. California*, *supra*, 386 U.S. 18, or the reasonable probability test in *People v. Watson* (1956) 46 Cal.2d 818, 836,[2] the error was not rendered harmless by the jury's rejection of voluntary intoxication as to the substantive carjacking offense. (See generally *People v. Pearson* (2012) 53 Cal.4th 306, 325 & fn. 9; *People v. Bolden* (2002) 29 Cal.4th 515, 559; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1134-1135.) We recognize the seeming illogic in concluding that the jury could have found that Hernandez, despite his supposed intoxication, *had* the specific intent to deprive Greene and Diaz of their vehicles, but also because of his intoxication *lacked* the specific intent to benefit his gang. (Cf. *Pearson,* at p. 325; *People v. Cain* (1995) 10 Cal.4th 1, 45, disapproved on another ground by *People v. Moon* (2005) 37 Cal.4th 1, 17.) Still, we must consider the instruction's impact on the

---

**2** To the extent this issue implicates the effectiveness of the assistance trial counsel provided, we discern no tactical reason to limit the voluntary intoxication's instruction to the substantive offense. (*Strickland v. Washington, supra,* 466 U.S. 668; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) The failure to provide effective assistance of counsel is prejudicial if it is reasonably probable the outcome would have been more favorable to defendant. (*In re Crew* (2011) 52 Cal.4th 126, 150.)

13

jury's consideration of the evidence supporting voluntary intoxication and the gang allegation.

Specifically, this was not a case in which the evidence to support the gang allegations, although sufficient, was overwhelming. (See generally *People v. Albillar, supra,* 51 Cal.4th at pp. 59-60 [stating the sufficiency of evidence standard of review].) Although there was evidence Hernandez had gang tattoos and wore gang-related clothing (a cap with a "P") while committing the carjackings, this alone would be insufficient to support the gang allegation. (See, e.g., *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1363 [crime couldn't have enhanced respect for gang members or intimidated community where nothing in the record, other than that minor and his companions all wore clothing with their gang color, indicated they identified with the gang].) What elevates this case is Hernandez's multiple references to "Lynwood Varrio Paragons." (Cf. *People v. Ochoa* (2009) 179 Cal.App.4th 650, 662 [insufficient evidence to support the true findings on a gang allegation, because "[d]efendant did not call out a gang name, display gang signs, wear gang clothing, or engage in gang graffiti while committing the instant offenses. There was no evidence of bragging or graffiti to take credit for the crimes. There was no testimony that the victim saw any of defendant's tattoos. There was no evidence the crimes were committed in Moreno Valley 13 gang territory or the territory of any of its rivals"].) Notwithstanding that Hernandez's statements were made after the carjackings were completed and while in the hospital to passersby unconnected to the crime, those statements could be reasonably interpreted as bragging about what he had just done, i.e., the carjackings. (See *People v. Rios* (2013) 222 Cal.App.4th 542, 567-568 [specific intent is rarely susceptible to direct proof and usually must be inferred from the facts and circumstances surrounding the offense].)

Hernandez's statements were thus crucial to the gang allegations. The context in which those statements were made was also important. They were made perhaps hours after the carjackings were completed and while Hernandez was strapped to a hospital gurney and suffering possibly drug-related convulsions caused by the methamphetamine,

14

amphetamine, alcohol, and cannabinoids in his system. The voluntary intoxication instruction, however, precluded the jury from determining whether Hernandez's statements about the Paragons resulted from intoxication or showed an intent to commit the crime to benefit the gang. In other words, the instruction precluded the jury from properly considering the essential evidence (i.e., the statements in the hospital) on which true findings on the gang allegations could be based. We therefore conclude that the instructional error was prejudicial and reversal is required.

## V.     The restitution order must be stricken.

Pursuant to the parties' stipulation, the trial court ordered Hernandez to pay $3,000 in restitution to Anguiano, who was not a named victim in counts 1 and 2 but whose car was struck by the FedEx truck Hernandez was driving. Hernandez now contends that the restitution order must be reversed, because Anguiano was not a "victim" to whom the restitution statute applies. We agree.

We review the trial court's restitution order for abuse of discretion. (*People v. Giordano* (2007) 42 Cal.4th 644, 663.) "[A]n order resting on a demonstrable legal error constitutes such an abuse." (*People v. Hume* (2011) 196 Cal.App.4th 990, 995.)

Crime victims have a state constitutional right to restitution for "losses they suffer" from the defendant who inflicted those losses. (Cal. Const., art. I, § 28, subd. (b)(13)(A); see also § 1202.4, subd. (a)(1) ["It is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime"]; *People v. Walker* (2014) 231 Cal.App.4th 1270, 1273-1274.) Accordingly, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims." (§ 1202.4, subd. (f); see also *People v. Runyan* (2012) 54 Cal.4th 849, 856.)

The question is whether Anguiano, who was not named in the charging document and was not carjacked, was a "victim" for the purpose of restitution under section 1202.4? Section 1202.4, subdivision (f), does not clearly define who is an "actual

15

victim."[3]  But "victim" has generally been defined as a person who was the " 'object' " of a crime.  (See, e.g., *People v. Crow* (1993) 6 Cal.4th 952, 957; *People v. Saint-Amans* (2005) 131 Cal.App.4th 1076, 1086.)  " ' "Actual" ' or ' "direct" ' victims are 'the real and immediate objects' of the offense."  (*Saint-Amans*, at p. 1086.)

Hernandez's offense or crime was carjacking.  Carjacking is "the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear."  (§ 215, subd. (a); see also *People v. Lopez* (2003) 31 Cal.4th 1051, 1055.)  The immediate "objects" of Hernandez's crimes were Greene (the FedEx truck driver), Diaz (the Tahoe's driver), and possibly FedEx (see generally *People v. Runyan*, *supra*, 54 Cal.4th at pp. 856-857 [defining who is a "direct victim," as that phrase is used in § 1202.4, subd. (k)(2), and other restitution statutes]; *People v. Martinez* (2005) 36 Cal.4th 384, 393; *People v. Slattery* (2008) 167 Cal.App.4th 1091, 1095-1096).  Although Anguiano's car was undoubtedly damaged by Hernandez, Anguiano and the accident Hernandez caused were not the objects of the carjacking.  (Compare *People v. Walker, supra,* 231 Cal.App.4th at pp. 1275-1276 [conduct encompassed by the crime of "DUI causing injury" supported restitution order to victims hit by the defendant but not named in the charging document].)  Hernandez could have been charged with crimes relating to Anguiano, for example, reckless driving (Veh. Code, § 23103, subd. (a)), but he was not.  We therefore conclude that the restitution order must be stricken.

---

**3**      Our use of the term "actual victim" is to be distinguished from people and entities who are defined as "victims" in subdivision (k) of section 1202.4.  Subdivision (k) provides that "victim" "shall include," among others, "the actual victim['s]" immediate surviving family, and entities that are direct victims of a crime.  (§ 1202.4, subd. (k)(1).)  Anguiano is not a "victim" as defined in subdivision (k), and the People make no argument he is.

## DISPOSITION

The judgment is reversed in part, remanded, and otherwise affirmed as modified. The true findings on the gang allegations under Penal Code section 186.22, subdivision (b)(1), are reversed and the matter is remanded for a retrial, in the People's discretion, on those allegations only. The judgment is modified by striking the $3,000 in restitution awarded to Erik Anguiano. As modified, the judgment is otherwise affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment reflecting this modification and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

EDMON, P. J.

LAVIN, J.

17