Filed 7/25/25  P. v. Sokolgz CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085455 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB23001026) |
| JERAMIAH LEVI SOKOLGZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Ronald M. Christianson, Judge.  (Retired Judge of the San Bernardino Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Flavio Nominati, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Jeramiah Levi Sokolgz of two counts of second degree murder for the violent assault and death of two people living in his former residence. On appeal, he challenges the trial court's decision to instruct the jury on aiding and abetting theories of liability and contends the court committed reversible error by admitting an opinion from a lay witness. We reject these claims as well as Sokolgz's assertion their cumulative effect requires reversal. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Trial Evidence*

A.    *Discovery of the Double Homicide*

On April 2, 2014, Lisa and Nicholas D. called the police to request a welfare check on their neighbors, Susan Wun and Robert Suzuki, who lived on Saffron Avenue in Highland (Saffron house). Lisa and Nicholas had grown concerned after noticing Susan and Robert had not taken out the trash and had left their air conditioner running day and night during cold weather, to the point it had accumulated a large chunk of ice. This had gone on for about two weeks by the time they summoned law enforcement.

Deputy Shannon Deasey[1] responded to the Saffron house on April 2, 2014 at 7:00 p.m. Although the lights were on inside the home, no one answered when he knocked on the door. Deasey could see through a window there were items in the house that were out of place. He knew from a

---

[1]    All members of law enforcement were employed by the San Bernardino County Sheriff's Department unless specified otherwise.

previous visit to that location that Susan owned two vehicles. One of them, a Mercedes SUV, was missing. There were no signs of forced entry.

Deputy Deasey called for backup, and a second deputy arrived. After additional investigation, they decided to kick open the garage door. Once inside, Deasey smelled the faint odor of a decomposed body and saw a brownish-red footprint on the ground. He opened the door that led from the garage into the house and noticed more bloody footprints as well as the strong odor of human decomposition.

The deputies began a room-to-room search. Items in a spare bedroom were in disarray, as if someone had been rummaging through them. There was a large amount of blood in the kitchen. Bloody drag marks led from the kitchen to a spare bathroom. The men tried to open the bathroom door, but something was blocking it. Deputy Deasey forced the door further. When he looked down, he saw the hair and head of a person. The deputies immediately exited the house and called the homicide unit.

A homicide team arrived. Detective Edward Bachman conducted a walkthrough of the house. The kitchen alone was an extensive crime scene. There was blood spatter on the cabinets and "a lot" of dry coagulated blood on the floor. There were cleaning substances on the counters and a bloodied mop. To Bachman, it looked like "the suspects tr[ied] to clean the scene up afterwards."

A comforter had been laid on the floor of a hallway that connected the kitchen to the dining room. Underneath it were multiple bloody shoe tracks going back and forth. The thermostat had been set to the lowest possible temperature, which the detective found odd, as the weather at the time was cold. The contents of a purse had been dumped out in the hallway; Susan's identification was found nearby.

There was a large amount of blood on the mattress in the primary bedroom. The spare bedroom and primary bedroom appeared to have been ransacked, with drawers and jewelry boxes strewn about. Family members confirmed that Susan had owned a substantial amount of jewelry, and that she kept valuables, including gold jewelry, in a safe hidden under the carpet in the closet of the spare bedroom. The safe was later opened and was discovered to be empty.

Officers found two receipts in the house for purchases made on March 21, 2014. The last time Barbara P., one of Susan's sisters, had heard from Susan was at 10:35 p.m. on March 21.

Detective Bachman finished his walkthrough in the spare bathroom. The victims' bodies were blocking the bathroom door, which had to be removed from its hinges so he could enter. Once inside, Bachman saw that the words "Karma Killer" had been written in wet, dripping blood on the bathroom wall. The victims were later confirmed to be Susan and Robert. There were impact marks on their heads consistent with blunt force injuries from a hammer that was found in the garage. For both victims, the manner of death was blunt force head injury and the cause of death was homicide.

Susan's Mercedes SUV was later recovered from an apartment complex in Redlands, approximately 10 miles from the crime scene. Two used latex gloves were sitting on the vehicle's front passenger seat. One of the homicide detectives testified that the discovery of the gloves indicated that whoever killed the decedents may have been wearing gloves.

B.     *Susan's Ownership of the Saffron House*

The Saffron house originally belonged to Susan and her ex-husband Wilson Wun. They purchased it in 1996, during their marriage. The couple installed a floor safe under the carpet in the closet of their spare bedroom.

They lived in the house until 2006, when they bought a new home. After they moved into the new house, they rented the Saffron house to Jessica S., a store manager of a beauty supply business that Susan and Wilson operated. Jessica lived in the house with her son, her mother, and her brother—Sokolgz. Wilson told Jessica about the floor safe, including its location and how to operate it.

After 2006, Wilson and Susan's marriage began to deteriorate. They fought, and on several occasions Wilson physically abused Susan. In 2011, the couple amicably divorced. They informally divided their assets without the use of attorneys. Wilson became obligated to pay Susan monthly alimony of $2,000 or $2,500. The couple also agreed that Susan would receive the Saffron house, but Wilson would make the monthly mortgage payments of approximately $1,500. They further agreed Susan would receive a total of $100,000 for her share of the couple's business, which Wilson would pay off at a rate of $1,000 per month.

Before the divorce, Wilson took out a life insurance policy on Susan's life. The benefit was $300,000, and he was the sole beneficiary. After the divorce, Wilson changed the mailing address for the policy to the address of his new residence and kept paying the insurance premiums. When asked why the policy "wasn't . . . going to Susan's house," Wilson said he "d[id]n't know" and offered that "[s]he didn't take that initiative."

After divorcing Wilson, Susan resumed living in the Saffron house. Jessica and her family had vacated the house on 30- or 60-days' notice. Within a short time, Susan stopped working and lived on Wilson's alimony payments. She started dating Robert, who moved in with her. When asked at trial whether he was jealous of Susan's new boyfriend, Wilson responded, "The only thing I can say was that both of them weren't working at the time."

He agreed he may have felt "a little bit of resentment" about "paying all this money so Susan and [Robert] could not work[.]"

C.    *Sokolgz's Movements Before and After the Homicides*

Sokolgz had attended a Christmas party held by Susan sometime after she and Wilson bought their second house.  At that party, he announced that he was joining the military.  He subsequently joined the Army and was discharged in 2012.  He moved to Alabama, where he lived with Allen H., an acquaintance from the military, and Allen's wife Jessica H.

After leaving the Army, Sokolgz got in touch with Sarah L., a friend from high school.  They would communicate with each other via Skype.  In these conversations, Sokolgz used "Jello JJ" and "Killa Karma" as his screen names.  "Jello J" was a nickname he had acquired in the military.

In March 2014, Sokolgz returned to California for a visit.  Sokolgz, Wilson, and two others met for dinner on March 15 or 18 (three to six days before March 21, the night of Susan's last communication with her sister).  Wilson did not think he complained about Susan or the payments he was making to her during the dinner.

On March 22, 2014 (the day after Susan's sister last heard from her), Sokolgz asked Sarah for a ride to LAX airport.  Sarah agreed and picked him up at his sister's apartment in Redlands at 10:00 p.m.  On the way to the airport, Sokolgz removed pieces of jewelry from a bag and asked Sarah if she wanted any.  Sarah was surprised because she had never seen Sokolgz with jewelry.  Although some of the pieces looked like real gold, Sarah declined to accept any.  As they neared the airport, Sokolgz revealed that he had not purchased a plane ticket.  They decided to get him a motel room instead and drove back to Redlands to look for one.  They did not succeed, and Sarah eventually dropped Sokolgz off at his sister's apartment.

6

Bory T., another California friend of Sokolgz's, also saw Sokolgz in March 2014. On the first occasion, they went to dinner and a movie. On the second occasion, Sokolgz demanded that Bory take him to the airport "right now," so Bory drove him to the Ontario airport. Sokolgz's demeanor during the ride was "[v]ery quiet" and "more suspicious than usual." He told Bory he "had an altercation with somebody." When they arrived at the airport, Sokolgz decided not to buy a ticket after learning it was going to be very expensive.

Bory and Sokolgz then arranged to visit Sean S., a mutual friend who lived in Las Vegas. They took a bus and arrived at Sean's townhouse that evening. When they arrived, Sokolgz insisted on going out to the strip right away. Bory and Sean were tired, so Sokolgz went out on his own. The men did not hear from Sokolgz again for almost three days. When they asked where he had been, Sokolgz said he "didn't remember anything" because it was "a crazy night of partying." Later, they asked Sokolgz why he was acting "all suspicious and secretive." Sokolgz responded that he was a hitman. Bory and Sean took the answer as a joke. Sokolgz also said that he "already did a job."

While the three were driving around Vegas, they stopped at a pawn shop so Sokolgz could sell "some stuff" he had in a black duffel bag. Police later learned he pawned a white Coach purse and a portable hard drive.

When it came time for Sokolgz to return to Alabama, he told Bory and Sean he had spent all his money, so they gave him money for a bus ticket. Sokolgz had also told Allen (his housemate in Alabama) that he had no money. Allen had purchased Sokolgz a bus ticket with a departure date of March 28, 2014 from Las Vegas.

D.    *Additional Investigation*

Because the homicide team had no immediate leads on the identity of the killer, it put out a press release about Susan and Robert's deaths. Detective Bachman was then contacted by Brent Hopkins, an investigator from Alabama. On April 23, 2014, Hopkins had seized articles of Sokolgz's property from Allen and Jessica H.'s house. The seized items included a computer, a red and black bag with rubber and cloth gloves inside it, and a pair of Converse tennis shoes. Hopkins reached out to Bachman after determining that Sokolgz's computer contained internet searches for the homicides described in the press release.

A detective analyzed the computer and learned that the names "Killa Karma" and "Karma Killer" had been used by a "JelloJJ" Skype account.[2] A criminalist was provided photos of two shoeprints from the crime scene and determined one had a similar outsole pattern to Converse and Levis shoes.

DNA swabs of items in the Saffron house, including water bottles found in the kitchen and doorknobs throughout the house, were tested against known DNA profiles of Wilson, Robert, Susan, Bory, Sokolgz, and two formerly charged co-defendants. One of the water bottles was determined to contain the DNA of at least three individuals. It was seven times more likely the DNA came from Sokolgz and two unrelated, unknown individuals rather than from three unrelated, unknown individuals.

A swab of the interior door handle for the spare bathroom (where the bodies were found) was determined to contain the DNA of three contributors,

---

[2]    On direct examination, the detective testified the names associated with the Skype account were "Killa Karma" and "Killer Karma." On cross-examination, after using his report to refresh his recollection, he testified the names were "Killa Karma" and "Karma Killer."

including Robert. There was strong support for Sokolgz being the second contributor. It was at least 430,000 times more likely the DNA mixture came from Robert, Sokolgz, and one unrelated, unknown individual rather than from Robert and two unrelated, unknown individuals. The DNA analyst testified that although DNA could last for "a while" on a doorknob, he would expect it to contain the DNA of more recent users.

## II.

### *Charges, Trial, and Conviction*

In 2023, Sokolgz was charged in an amended information with the murder of Susan (Pen. Code[3], § 187, subd. (a); count 1) and Robert (§ 187, subd. (a); count 2). As to each count, it was specially alleged that multiple murders were committed in the same case (§ 190.2, subd. (a)(3)), that Sokolgz was previously convicted of first degree murder in Alabama (*id.*, subd. (a)(2))[4], and that the murders were committed or aided and abetted by Sokolgz while he was engaged in the commission of a robbery (*id.*, subd. (a)(17)(A)).

The trial lasted 15 days. The prosecution offered testimony from numerous witnesses, including Wilson; two of Susan's sisters; Sokolgz's friends Sarah and Bory and housemates Allen and Jessica H.; and numerous investigating law enforcement witnesses, including a DNA analyst and the Alabama investigator. The defense did not present evidence.

In closing arguments, the prosecutor told the jury it could find Sokolgz guilty of murder under any of several theories, including first or second degree murder, aiding and abetting the actual murderer, or felony murder

---

[3]     Further unspecified statutory references are to the Penal Code.

[4]     This allegation was bifurcated and was not presented to the jury.

(whether as an actual killer, a direct aider and abettor with intent to kill, or a major participant in an underlying felony who acted with reckless indifference to human life). The defense urged the jury to consider the circumstantial evidence with caution and emphasized the prosecution's burden to prove guilt beyond a reasonable doubt.

The jury deliberated for a total of 11 hours, during which it sent notes requesting the readback of certain testimony. As to each count, it found Sokolgz guilty of second degree murder. And it returned both a true finding on the multiple-murder special circumstance and a not true finding on the felony murder special circumstance. The special circumstances true finding and bifurcated prior murder allegation were later vacated by stipulation of the parties on the ground the jury's second degree murder verdicts made the special circumstances inapplicable. (See § 190.2, subd. (a) [special circumstances penalties apply to a defendant found guilty of murder in the first degree].)

## DISCUSSION

### I.

### *No Prejudicial Evidentiary Error*

Sokolgz contends the trial court committed reversible error by failing to exclude lay opinion testimony of Hester S., one of Susan's sisters. On direct examination, the prosecutor asked her, "[I]n your reflection upon the case, Ms. [S.], who's the one individual that comes to mind that could have benefitted from the death of Susan?" Over defense counsel's objection that the question called for speculation, Hester responded, "I mean, immediately it appears to me that Wilson had the most to gain from Susan being dead." The prosecutor then elicited that Hester was aware of a life insurance policy on Susan's life. Defense counsel did not ask her any questions.

10

Sokolgz asserts the trial court erred by permitting Hester to provide inadmissible lay opinion testimony. He contends the error transcended the violation of state law and infringed on his federal due process right to a fair trial. The People respond that the defense objection on grounds of speculation was inadequate to preserve Sokolgz's ability to argue on appeal that the testimony was an improper lay opinion. (See *People v. Dykes* (2009) 46 Cal.4th 731, 756 ["[T]rial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal."].) They also contend the trial court's ruling was neither an abuse of discretion nor prejudicial.

We need not consider whether the testimony was inadmissible or the challenge to it was forfeited. Even if we assume the trial court erred and Sokolgz preserved the error for appeal, admission of the evidence was not prejudicial.

Improper admission of lay opinion testimony is generally considered a state law error subject to the *Watson*[5] standard for evaluating prejudice. (*People v. Shorts* (2017) 9 Cal.App.5th 350, 362; see *People v. DeHoyos* (2013) 57 Cal.4th 79, 130–131 [applying *Watson* test to determine prejudice of alleged error in admitting lay opinion testimony]; *People v. Hinton* (2006) 37 Cal.4th 839, 889 [same]; *People v. Bradley* (2012) 208 Cal.App.4th 64, 84 (*Bradley*) [same].) Under that standard, we consider whether it is reasonably probable the defendant would have obtained a more favorable verdict had the challenged evidence not been admitted. (*Watson, supra*, 46 Cal.2d at p. 836.)

Under *Chapman v. California* (1967) 386 U.S. 18, 24, where an error rises to the level that it implicates the defendant's federal constitutional

---

[5]     *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

rights, reversal is required unless the error was harmless beyond a reasonable doubt. Here, however, the trial court merely applied ordinary rules of evidence. Doing so did not impair Sokolgz's Fourteenth Amendment right to a fair trial. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.) Therefore, we disagree with him that the federal Constitution is implicated here.

However, we would find the asserted error harmless under either standard. The People argue, and we agree, Hester's testimony essentially duplicated motive evidence elicited from Wilson himself in far greater detail. Moreover, we see no indication Hester's lone assertion affected the outcome of the trial. Sokolgz claims that it did because the evidence he was the actual killer was not compelling. We disagree.

The evidence of his guilt for the murders was strong. The discovery of the words "Karma Killer" inscribed in blood above the victims' bodies was powerful evidence Sokolgz was the actual killer, intended for Susan and Robert to die, and was proud of accomplishing their deaths. We also reject Sokolgz's contention that the failure of the jury to embrace fully the prosecution's case, the jury deliberations of 11 hours, and the readback requests (of testimony of two law enforcement witnesses, Wilson, and Bory) "establish the closeness of this case such that the prejudicial impact of the error beams bright." We see no indication any of the circumstances he identifies was related to, or demonstrates prejudice from, the admission of Hester's lay opinion.

For these reasons, we find no merit in Sokolgz's claim of prejudicial evidentiary error.

II.

*No Instructional Error*

The trial court instructed the jury on aiding and abetting liability pursuant to CALCRIM Nos. 400 and 401. (See CALCRIM No. 400 (Aiding and Abetting: General Principles) ["A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."]; CALCRIM No. 401 (Aiding and Abetting: Intended Crimes) ["Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."].)

Sokolgz argues giving these instructions was error because aiding and abetting was a factually invalid theory of liability. This is so, he claims, because there was insufficient evidence that more than one person committed the homicides, or that he aided, promoted, encouraged, or instigated another to commit them. He contends the error violated state law and the federal Constitution because it lessened the prosecution's burden of proof, and that it was prejudicial under the standards for gauging state and federal instructional error. The People respond that giving the aiding and abetting instructions was neither erroneous nor prejudicial. Because we conclude there was no error, we do not reach the parties' prejudice arguments.

In a criminal case, " 'even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.' " (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) Instruction is required on the legal principles "that are commonly connected with the facts adduced at trial and that are necessary for the jury's understanding of the case." (*People v. Young* (2005) 34 Cal.4th 1149, 1200 (*Young*).) Conversely, "[i]t is error to give an instruction which, while correctly stating a principle of

13

law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

Substantial evidence must exist for a trial court to provide a particular jury instruction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206 (*Cole*).) In this context, substantial evidence "is evidence sufficient to 'deserve consideration by the jury.' " (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) In other words, substantial evidence is evidence that "would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof." (*Cole*, at p. 1206.) "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence." (*People v. Tice* (2023) 89 Cal.App.5th 246, 256 [cleaned up].)

We independently review the trial court's decision to give a particular instruction. (See *People v. Waidla* (2000) 22 Cal.4th 690, 733 [whether to give an instruction "entails the resolution of a mixed question of law and fact" that is "predominantly legal" and therefore "examined without deference"]; *Cole*, *supra*, 33 Cal.4th at p. 1206 [decision to give instruction reviewed de novo].) Here, we must "determine whether a reasonable trier of fact could have found beyond a reasonable doubt that [Sokolgz] committed murder based on a[n aiding and abetting] theory." (*Cole*, at p. 1206.)

To aid and abet the commission of a crime requires two individuals—an aider and abettor, and a perpetrator who directly carries out the crime. (CALCRIM No. 400.) A person is guilty as an aider and abettor of a crime when he acts with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of encouraging or facilitating the commission of the crime, and his act or advice in some manner aids, promotes, encourages or instigates the commission of the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 560–561.)

14

Sokolgz's argument is that there is insufficient evidence more than one person carried out the murders or that he aided, promoted, encouraged, or instigated someone else to commit them. The People respond that the forensic evidence revealed more than one suspect may have been involved, and that additional evidence from the scene supported holding Sokolgz liable as an aider and abettor of the murders.

We agree with the People. The prosecution established that multiple bloody shoeprints were found inside the house. The shoeprint analyst examined two of them against a database of approximately 30,000 shoes. She was only able to identify a match for one—the one with the imprint pattern similar to a Converse or Levis brand shoe. She testified the second print did not match any pattern in the database. From the foregoing facts, the jury could draw a rational, nonspeculative inference two people, one wearing Converse or Levis brand shoes (inferably Sokolgz, who was later determined to possess Converse shoes) and the other wearing some other unidentified brand of shoes, had traipsed through the victims' wet blood. Sokolgz's reply brief argument—that the expert could only identify the make and brand of shoeprints—misses the point. The fact that only one of the two prints could be matched to known brands is evidence of two dissimilar shoes, and two different people.

The DNA evidence, particularly when considered in light of the shoeprint analysis, provided further support for the proposition that Sokolgz was not the only one involved in the crimes. No genetic material was recovered from the hammer found in the garage, meaning it could not be confirmed who wielded the hammer or that it was, in fact, the murder weapon. Among the water bottles tested, only one had Sokolgz's DNA. Three had DNA mixtures with unidentified contributors. Multiple doorknobs

15

throughout the house were also tested. Only the interior door handle to the spare bathroom contained Sokolgz's DNA; it also had the DNA of an unknown individual. Other doorknobs, specifically the interior doorknob of the garage and front bedroom interior door handle, contained the DNA of an unknown individual in addition to either Susan or Robert.

Sokolgz tries to undermine the significance of the door handle evidence by arguing DNA can exist for long periods of time. However, the DNA expert suggested this would not be the case with a doorknob. He testified the nature of touch DNA is that it deposits new DNA while removing existing DNA. He said he would interpret DNA on a regularly used item, like a doorknob, to indicate "someone had contacted that [doorknob] more recent[ly] or at least as recent[ly] as other individuals on the doorknob." Based on the forensic evidence, a jury could properly infer Sokolgz was accompanied by at least one other individual who moved throughout the house, opening doors in the garage (where the hammer matching the victims' wounds was found), spare bedroom (the location of the floor safe), and spare bathroom (where the bodies were deposited), and walking through the victims' wet blood.

Contrary to Sokolgz's contention there is no evidence he aided another to commit the murders, the fact that there were multiple homicides in the house, one in the kitchen and the other in the primary bedroom, supported a reasonable inference the killings were perpetrated by more than one assailant. A jury could properly infer from the lack of forced entry, and Susan's familiarity with Sokolgz, that Sokolgz's participation was critical to accomplishing the killings because it allowed him and whoever was with him to enter the house without raising the victims' suspicions. It was also inferable Sokolgz had an independent motive to kill to avoid being identified by the victims later. And the presence of the words "Karma Killer" written in

16

blood on the bathroom wall over the victims' dead bodies indicates Sokolgz, far from being dismayed by their deaths, was boasting about them—strong evidence he intended for them to die. (See *People v. Potts* (2019) 6 Cal.5th 1012, 1028 ["[A] jury could quite reasonably infer that a person who followed a horrific double homicide by opening a package of cookies was not surprised and dismayed by what he had done, as one who acted impulsively might be."].)

Moreover, Sokolgz fails to acknowledge that the theories of murder liability on which the jury was instructed included felony murder. (See CALCRIM No. 540B (Felony Murder: First Degree–Coparticipant Allegedly Committed Fatal Act).) The instruction told the jury it could find him guilty if, among other requirements, he either committed or "aided and abetted robbery and/or burglary"; intended to commit or "intended to aid and abet" the commission of these crimes; and either "aided and abetted" the killing of Susan and/or Robert with intent to kill, or was a major participant in the underlying robbery and/or burglary who acted with reckless indifference to human life. (See *ibid.*) It specifically directed the jury to "refer to the separate instructions that I have given you on aiding and abetting" and states that it "must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder." (*Ibid.*) Sokolgz has not challenged the giving of this instruction. Given its contents, we fail to see how the trial court could have erred by instructing the jury on the principles of aiding and abetting. (See *Young, supra,* 34 Cal.4th at p. 1200 [instruction is required on legal principles "commonly connected with the facts adduced at trial and that are necessary for the jury's understanding of the case"].)

Moreover, substantial evidence supported a finding of guilt under *at least* one of the aiding and abetting theories in this felony murder instruction. We have already explained how the evidence would have supported a finding he directly aided and abetted another to commit murder and did so with homicidal intent. That same evidence, plus the evidence Sokolgz was in possession of a purse and women's jewelry after the crimes (from which the jury could reasonably infer the initial entry into the home was for the purpose of committing theft), provided ample support for a finding he intentionally facilitated a burglary, (see § 459; CALCRIM No. 1700 (Burglary) [essential elements of burglary are (1) entry with (2) intent to commit theft or a felony]), and the deaths occurred during the commission of the burglary (CALCRIM No. 540B). Thus, substantial evidence existed to support finding him liable for felony murder as a co-participant in a burglary who, with intent to kill, aided and abetted the perpetrator's commission of first degree murder.

### III.

### *No Cumulative Error*

Sokolgz argues that the cumulative effect of the errors he asserts on appeal requires reversal of the judgment. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Here, however, we have rejected one of Sokolgz's two claims of error, so there are not multiple errors to accumulate. (*People v. Weaver* (2012) 53 Cal.4th 1056, 1077.)

## DISPOSITION

The judgment is affirmed.

DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.